Case No. 22-50936

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

## MWK RECRUITING INCORPORATED

Plaintiff – Appellee

v.

## EVAN P. JOWERS,

Defendant – Appellant

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

---

## **BRIEF OF APPELLANT**

---

Aaron G. McLeod
ADAMS AND REESE LLP
1901 6th Avenue North
Suite 1110
Birmingham, AL 35203
(205) 250-5000
aaron.mcleod@arlaw.com
Counsel for Defendant-Appellant
Evan P. Jowers

Richard N. Asfar
ALMAZAN LAW
515 W. Bay Street
Suite 210
Tampa, FL 33606
(305) 665-6681
rasfar @almazanlaw.com
Counsel for Defendant-Appellant
Evan P. Jowers

MWK Recruiting Incorporated v. Evan P. Jowers
Case No. 22-50936

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

- Adams and Reese LLP, counsel for Appellant
- Almazan Law, counsel for Appellant
- Asfar, Richard N., counsel for Appellant
- Austin, The Honorable Andrew W., United States Magistrate Judge
- Bookhout, James C., counsel for Appellant
- Cole, Kevin J., counsel for Appellant
- Counsel Holdings, Inc., Appellee
- Counsel Unlimited LLC, Appellee
- Daignault Iyer LLP, counsel for Appellee
- DLA Piper LLP (US), counsel for Appellant
- Ellis, Zachary H., counsel for Appellee
- Katz, Marc D., counsel for Appellant
- KJC Law Group, counsel for Appellant
- Jowers, Evan P., Appellant
- Kinney, Michelle W., Appellee
- Kinney, Robert E., Appellee

- Kinney Recruiting, LLC, Appellee

- Kinney Recruiting Limited, Appellee

- Legis Ventures (HK) Company Limited (aka Jowers / Vargas), Appellee

- Loanzon, Tristan C., counsel for Appellee

- Loanzon LLP, counsel for Appellee

- McLeod, Aaron G., counsel for Appellant

- Mort III, Raymond W., counsel for Appellee

- MWK Recruiting, Inc., Appellee

- Pitman, The Honorable Robert L., United States District Judge

- Recruiting Partners GP, Inc., Appellee

- Siegel, Martin J., counsel for Appellee

- Stefanova, Marina, counsel for Appellant

- Tauler, Robert, counsel for Appellant

- Tauler Smith, counsel for Appellant

- The Mort Law Firm, PLLC, counsel for Appellee

- Vargas, Alejandro, Appellee

- Vinkurova, Yuliya, Appellee


s/ Richard N. Asfar
Attorney of record for Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellant Evan P. Jowers respectfully requests oral argument under Fifth Circuit Rule 28.2.3 and Federal Rule of Appellate Procedure 34(a) because he believes it could significantly aid the Court's decisional process in this case. This case results from a voluminous record, and the Federal Trade Commission is contemplating a proposed rule change which would ban a matter implicated by this appeal—non-compete agreements and restrictive covenants that function like non-competes. Jowers submits that argument would provide focus on the issues that interest the Court in the wake of briefing.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................C1

STATEMENT REGARDING ORAL ARGUMENT ..................................i

TABLE OF AUTHORITIES.........................................................iv

JURISDICTIONAL STATEMENT ........................................... 1

STATEMENT OF THE ISSUES ................................................. 2

STATEMENT OF THE CASE .................................................. 3

   I. Procedural History ..................................................... 3

   II. Statement of the Facts.............................................. 7

SUMMARY OF THE ARGUMENT.........................................17

ARGUMENT ..................................................................... 19

I.     Standard of Review ................................................... 19

       A.   Motion to dismiss .................................................. 19

       B.   Motion for summary judgment ............................... 19

       C.   Bench trial............................................................ 21

II.    MWK's Trade Secret Misappropriation Judgment Under Texas and Federal Law Should be Reversed .................................... 21

       A.   MWK's second amended complaint did not adequately plead the requisite trade secret under Texas and federal law .................. 23

       B.   In the alternative, judgment as a matter of law should have been entered on the trade secret misappropriation claims under Texas and federal law ....................................................... 25

C.    MWK failed to demonstrate at trial that any purportedly misappropriated information was a trade secret ...................... 26

III.    MWK's Breach of Employment Agreement Restrictive Covenants Judgment under Florida Law Should also be Reversed ................... 28

A.    Summary judgment should have been entered on the breach of Employment Agreement restrictive covenant claim under Florida law ............................................................. 30

B.    MWK's failure to demonstrate at trial the alleged "legitimate business interest" that the restrictive covenant was purportedly "reasonably necessary" to protect should have been fatal to its breach of Employment Agreement restrictive covenants claim ............................................................................... 31

IV.    MWK's Unclean Hands Defeat its Breach of Employment Agreement Restrictive Covenants Claim ............................................... 31

CONCLUSION ........................................................................ 37

CERTIFICATE OF SERVICE ................................................. 38

CERTIFICATE OF COMPLIANCE ........................................ 38

# TABLE OF AUTHORITIES

**Cases**

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) .......................................................... 20

Ashcroft v. Iqbal,
    556 U.S. 662 (2009) .......................................................... 19

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544 (2007) .......................................................... 19

Bradley v. Health Coal., Inc.,
    687 So. 2d 329 (Fla. Dist. Ct. App. 1997) ........................ 32

Cataphote Corp. v. Hudson,
    422 F.2d 1290 (5th Cir. 1970) ........................................... 24

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) .......................................................... 20

Coleman v. BP Expl. & Prod., Inc.,
    19 F.4th 720 (5th Cir. 2021) ............................................. 20

Coleman v. B. R. Chamberlain & Sons, Inc.,
    766 So. 2d 427 (Fla. Dist. Ct. App. 2000) ....................... 33

Dickinson v. Auto Ctr. Mfg. Co.,
    733 F.2d 1092 (5th Cir. 1983) ............................................. 1

Greene v. Greenwood Pub. Sch. Dist.,
    890 F.3d 240 (5th Cir. 2018) ............................................. 19

Guy Carpenter & Co. v. Provenzale,
    334 F.3d 459 (5th Cir. 2003) ............................................. 24

Interox Am. v. PPG Indus., Inc.,
　　736 F.2d 194 (5th Cir. 1984) ............................................................. 24

Johnson v. Cooper T. Smith Stevedoring Co., Inc.,
　　74 F.4th 268 (5th Cir. 2023) ....................................................... 20, 21

Little v. Liquid Air Corp.,
　　37 F.3d 1069 (5th Cir. 1994) (en banc) ............................................. 20

Lormand v. US Unwired, Inc.,
　　565 F.3d 228 (5th Cir. 2009) ............................................................ 19

Luwisch v. Am. Marine Corp.,
　　956 F.3d 320 (5th Cir. 2020) ............................................................ 21

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
　　475 U.S. 574 (1986) .................................................................21, 26

MWK Recruiting Inc. v. Jowers,
　　833 F. App'x 560 (5th Cir. 2020) ........................................................ 3

Nat'l Horsemen's Benevolent and Protective Association v. Black,
　　53 F.4th 869 (5th Cir. 2022) ....................................................... 19, 20

Papasan v. Allain,
　　478 U.S. 265 (1986)......................................................................... 19

Proino Breakfast Club, II, Inc. v. OGI Cap., Inc.,
　　331 So. 3d 846 (Fla. Dist. Ct. App. 202) .......................................... 32

Quality Sys., Inc. v. Warman,
　　132 F. Supp. 2d 349 (D. Md. 2001) ............................................ 27, 28

Rogers v. Jarrett,
　　63 F.4th 971 (5th Cir. 2023) ............................................................ 20

Tuchman v. DSC Comm. Corp.,
　　14 F.3d 1061 (5th Cir. 1994)............................................................ 19

## Statutes

18 U.S.C. § 1839(3) ........................................................ 22, 25, 26

28 U.S.C. § 1291 ..................................................................... 1

28 U.S.C. § 1331 ..................................................................... 1

28 U.S.C. § 1332 ..................................................................... 1

FED. R. CIV. P. 56(a) ........................................................... 20

Fla. Stat. § 542.335(1) ........................................................ 17

Fla. Stat. § 542.335(1)(b) ............................................... 28, 31

Fla. Stat. § 542.335(1)(c) ............................................... 28, 31

Fla. Stat. § 542.335(1)(g)3 ................................................ 32

Md. Code Ann., Com. Law § 11-1201(e) ......................... 27, 28

Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6) ......... 22, 25, 26

## Secondary Authority

[proposed] 16 C.F.R. § 910.1 (proposed FTC Rule § 910.1) ............... 34, 35

[proposed] 16 C.F.R. § 910.2 (proposed FTC Rule § 910.2) ............... 34, 35

[proposed] 16 C.F.R. § 910.4 (proposed FTC Rule § 910.4) ............... 34, 35

RESTRICTIONS ON RIGHT TO PRACTICE, MRPC RULE 5.6(a) .... 28

## JURISDICTIONAL STATEMENT

The Honorable Court has jurisdiction to review the July 25, 2023 *Amended Final Judgment* entered by the United States District Court for the Western District of Texas under 28 U.S.C. § 1291 because it is a final decision of a United States District Court that is not subject to direct review by the Supreme Court. ROA.14068-14070.

The Court has jurisdiction to review interlocutory rulings prior to the rendition of the *Amended Final Judgment* under the merger rule. Dickinson v. Auto Ctr. Mfg. Co., 733 F.2d 1092, 1102 (5th Cir. 1983).

The lower court had subject-matter jurisdiction under both 28 U.S.C. §§ 1331 and 1332 because the operative complaint alleged a federal claim, and because there was complete diversity between the parties and more than $75,000 was in controversy, exclusive of interest and costs. ROA.1686-1732.

## STATEMENT OF THE ISSUES

1.    As to Appellee MWK's misappropriation of trade secret claims under the Texas Uniform Trade Secrets Act and the Federal Defend Trade Secrets Act, whether MWK met its burden to demonstrate at the pleading stage, the dispositive motion stage, and at trial that information pertaining to six attorney candidates constituted MWK's trade secret.

2.    With respect to MWK's breach of employment contract restrictive covenants claim under Florida law, whether MWK met its burden statutory to burden to "plead and prove" that the restrictive covenants were "reasonably necessary" to protect its "legitimate business interest."

3.    Whether it was error to decline to rule in Appellant Jowers's favor on his "unclean hands" affirmative defense where evidence at trial demonstrated, among other things, that MWK publicized Jowers's relocation to Hong Kong to further MWK's business while failing to follow through on the requisite work visa for approximately 18 months, cover the cost of the Hong Kong facilities used to further MWK's business, or enter into a Hong Kong employment contract with Jowers to avoid Hong Kong law requiring "garden leave" pay to enforce restrictive covenants.

## STATEMENT OF THE CASE

The Court previously adjudicated an interlocutory appeal in this case. MWK Recruiting Inc. v. Jowers, 833 F. App'x 560 (5th Cir. 2020) (reversing order granting MWK's motion for foreign antisuit injunction). The case now returns following entry of an *Amended Final Judgment*. ROA.14068-14070.

## I.    **Procedural History**

Plaintiff-Appellee MWK Recruiting, LLC[1] ("MWK") filed this lawsuit in the District Court of Travis County, against Defendant-Appellant Evan P. Jowers ("Jowers") and others in March of 2017. ROA.70-209.

This action was removed to the United States District Court for the Western District of Texas in May of 2018. ROA.54-399.

MWK filed its operative *Second Amended Complaint* in March of 2019. ROA.1686-1940. Through that pleading, MWK alleged counts against Jowers entitled: (i) "Federal Trade Secret Misappropriation," (ii) "Texas Trade Secret Misappropriation," (iii) "Breach of Contract Employment Agreement" (relating to restrictive covenants), (iv) "Breach of Contract Line of Credit," and (v) "Breach of Contract Loan." ROA.1686-1732.

In response, Jowers and his then-codefendants filed *Defendants' Motion to Dismiss Second Amended Complaint*. ROA.1951-1988. Jowers and his

---

[1] Following entry of the *Final Judgment*, the lower court amended the case style and final judgment to, among other things, replace Appellee MWK with "Counsel Holdings, Inc." ROA.14068-14070. Because the majority of the court filings reference MWK, to facilitate review, undersigned refers to Appellee as "MWK."

codefendants argued that the *Second Amended Complaint* failed to state a claim because: (i) it failed to plausibly identify a trade secret or the misappropriation of any trade secret; and (ii) it failed to plead any protectible business interest given that the relationships personally developed by Jowers are not protectible business interests, the restrictive covenants were overbroad and unreasonable, and no breach was specifically alleged. ROA.1975-1983

Following briefing, the lower court entered an *Order* granting in part *Defendants' Motion to Dismiss Second Amended Complaint*. ROA.2052-2082. Specifically, that order dismissed MWK's civil conspiracy claim and all of MWK's claims against Jowers's co-defendants for either lack of personal jurisdiction or failure to state a claim. ROA.2081-2082. But it denied the motion to dismiss "with respect to the claims against Jowers in all other respects." ROA.2082.

Thereafter, Jowers answered the complaint by denying material allegations and asserting a number of affirmative defenses, including unclean hands. ROA.3174-3246. He also alleged counterclaims, including breach of the Jowers Employment Agreement by failing to cover Hong Kong office expenses. ROA.3174-3246.

Following motion practice, the lower court granted MWK's motion to withdraw its jury trial demand and strike Jowers's jury trial demand. ROA.4648-4658.

After the pleadings closed, MWK and Jowers both moved for partial judgment on the pleadings. ROA.3607-3630, ROA.4000-4021. The lower court adjudicated the motions by granting MWK's motion in part and dismissing several of Jowers's counterclaims, and by denying Jowers's motion. ROA.5782-5804. At the Court's direction, Jowers filed an amended answer which omitted the dismissed counterclaims, and MWK responded to Jowers's pared-down counterclaim. ROA.5896-5964; ROA.6054-6089.

Thereafter, the parties filed dispositive motions. ROA. 6090-6101, ROA.6465-6491. Jowers moved for summary judgment on all counts alleged against him, arguing, among other things, that the liquidated damages provision in the Jowers Employment Agreement was unenforceable, and that the information which was the subject of MWK's trade secret counts were neither trade secret nor misappropriated. ROA.6465-6491.

After briefing was complete, the lower court issued an *Order* which: (i) denied Jowers's summary judgment motion in its entirety, and (ii) entered summary judgment on all remaining counterclaims alleged by Jowers except Count I for breach of the Jowers Employment Agreement by failing to cover certain Hong Kong office expenses.[2] ROA.13640-13671.

There was no pretrial order specifying the claims and issues to be tried. Instead, each party submitted pretrial submissions, including pre-trial

---

[2] The Court would later enter an *Order* amending the summary judgment order to deny MWK's motion for summary judgment directed to Jowers's breach of the Jowers Employment Agreement for retroactive reduction of the commission due for the placement of candidate Hui Xu. ROA. 7446-7453.

conclusions of law and findings of fact. ROA.7189-7197, ROA.7313-7327. Both parties' pretrial submissions addressed the unclean hands affirmative defense. ROA.7192, ROA.7323.

The lower court held a three-day bench trial in December of 2021. ROA.12018-12587. After MWK rested its case, Jowers made an ore tenus Rule 52(c) motion for judgment on all of MWK's counts arguing that MWK failed to meet its burden with respect to the trade secret counts, Jowers's Employment Agreement was unenforceable, and other matters. ROA.12526-12534. The trial court denied the motion without prejudice. ROA.12534-12535.

In due course, the parties submitted competing post-trial proposed conclusions of law and findings of fact. ROA.10183-10297, ROA.10298-10318.

Approximately seven months later, the lower court entered its *Findings of Fact and Conclusions of Law*, and a *Final Judgment*. ROA.10319-10362, ROA.10363-10364. The lower court found that the information Jowers gathered regarding six candidates and potential candidates was a trade secret, and was misappropriated. ROA.10339-10347. The lower court also concluded that MWK articulated a legitimate business interest protected by the Employment Agreement's restrictive covenants (specifically referencing the trade secret which was the subject of the trade secrets ruling), though the lower court determined it was overbroad in some aspects and modified it to apply only to placements at law firms which Jowers actually had contact with

during the 12 months preceding the end of his employment. ROA.10347-10351. With regard to Jowers's affirmative defenses, the lower court concluded several were either waived or unsupported by the evidence, and declined to rule in Jowers's favor on others because, in the court's view, Jowers failed to testify about or direct the Court to any evidence regarding them or to mention them in post-trial briefing. ROA.10333, ROA.10350-10354.

Approximately ten months later, and following further motion practice, the lower court entered the *Amended Final Judgment*, which awards MWK $515,326.20 on its misappropriation claims, $3,082,841.72 on its breach of the Employment Agreement (restrictive covenant) claim based on that agreement's liquidated damages clause, $26,204.90 on the breach of the "forgivable loan" claim, and $15,759.78 on the "revolving loan" claim for a total compensatory award of $3,640,132.60, plus $826,749.63 in pre-judgment interest. ROA.14068-14070.

## II.   Statement of the Facts

MWK's principal, Robert Kinney, and Jowers met in the early 2000s when they were working as legal recruiters for BCG Search. ROA.12078. Kinney left BCG in 2004 and started his own legal recruiting company. ROA.12078. Jowers left BCG thereafter, and would later start his own recruiting business. ROA.12425-12426.

Jowers began working for a Kinney recruiting company in April of 2006. ROA.12427, ROA.12080. In December of 2006, Jowers executed and

returned by fax to Kinney an "Associate Recruiter Employment Agreement" with a May 1, 2006 effective date (the "Employment Agreement"). ROA.9946-9948. That document identifies "Kinney Recruiting, L.P." as the "Company" and Evan Jowers as the "Employee," and is included in the *Record Excerpt* accompanying this brief.[3] ROA.7975-7985. The Employment Agreement includes the following pertinent provisions on non-solicitation, liquidated damages, and commissions:

8. NON-SOLICITATION COVENANTS

8.1    For a period of one year following the effective date of termination of the Employee's employment, the Employee shall not, in the course of the personnel placement service business, solicit or provide services to any candidate or client with whom the Employee had contact with, knowledge of, or access to during the twelve months immediately preceding the effective date of termination, and shall not assist any entity other than the Company in so doing.

* * *

9. REMEDIES

9.1    The actual damages resulting from violation of Sections 7 and/or 8 of this Agreement by the Employee will be difficult or impossible to ascertain. In the event of such a violation, the Employee shall pay to the Company, upon demand, as liquidated damages, and not as a penalty, the following:

9.1.1 Any fee paid for SERVICES rendered in violation of Section 7 and/or 8, whether paid to the Employee or to any other person, firm, or entity; plus

---

[3] Because one of the documents required to be included in the *Record Excerpts* is within the sealed portion of the record, it is filed with a motion to file under seal.

9.1.2  All costs and expenses, including reasonable attorney's fees, incurred by the Company in the enforcement of its rights relating to such violation.

\* \* \*

## "EXHIBIT A"

\* \* \*

2.2. "GROSS COMMISSIONS" shall be computed each pay period on NET CASH-IN for the calendar year pursuant to the following schedule:

| Percentage of Commissions | Calendar Year Net Cash-In |
|---|---|
| 45% | Of the first $75,000 |
| 50% | Of the next $75,000 |
| 55% | Of the next $75,000 |
| 60% | Of the next $75,000 |
| 65% | Of the excess over $300,000 |

ROA.7975-7985.

In 2008, Jowers's commission scale was set to 62.5% across the board as a result of advertising expenses. ROA.12084. In March of 2008, Kinney sent a firm-wide e-mail stating: "After consulting with the people who are actually recruiting in Asia and have the most stake in our continued success in the region, what we have decided to do is to amend the commission schedule to everyone's employment agreement to share the cost of this sponsorship pro-rata among those who make placements in Asia and the company in proportion to net income from placements made in the region." ROA.9954.

In December of 2008, Alexis Lamb was hired to be Kinney's first employee "for our office in Hong Kong," and she began working in Hong

Kong for Kinney's Hong Kong recruiting company, Kinney Recruiting Limited ("Kinney HK"), around that time. ROA.12217, ROA.12542, ROA.9956, ROA.10153. Approximately six months later, Kinney advised Lamb by e-mail that "[i]f you're willing to commit to continuing to crank at it for the foreseeable future, I'm willing to back you up and get the visa pushed through ASAP." ROA.9963. Several months later, Kinney HK and Lamb entered into an "Associate Recruiter Employment Agreement" which was subject to Hong Kong law, and includes a "compensation upon termination" provision in its "Exhibit A." ROA.9966-9979.

On January 28, 2009, Kinney e-mailed Jowers a number of changes to his compensation package and employment terms, including: "1. Your commissions go 45% across the board for 2009. This will apply to all amounts received in 2009, including the three commissions that we are currently expecting but have not yet received. * * * 7. The noncompete *will be amended* to apply to Hong Kong/China and be fully enforceable." ROA.9926-9927, ROA.12460 (emphasis supplied (e.s.)).

Following an e-mail exchange, on January 29, 2009, Kinney directed Jowers to "call and let's work out your issues in time for me to put payroll in today at 3 pm EST. I'm not ponying up another $20k this month until I know you are aboard with something I can live with. I'm deleting the emails because I don't want to try to parse them." ROA.9924. Following a call and further e-mail exchange that same day, Jowers responded "yes" to Kinney's e-mail asking Jowers to "please confirm that you agree to the terms as stated

in my original email about the new system, and that there are no further oral agreements beyond these terms at this time." ROA.9923.

Both Kinney and Jowers testified that in 2010, Jowers's compensation was adjusted to 45% for commissions up to $100,000 and 50% for commissions exceeding $100,000, and that this was the last change to Jowers's commission-based compensation. ROA.12084-12085, ROA.12369-12370, ROA.12456. Jowers testified that in addition, from 2010 on, Jowers was also to receive bonuses which resulted in total compensation of 55% of commissions on amounts between $200,000 and $300,000, and 60% for amounts exceeding $300,000. ROA.12369, ROA.12456. Consistent with that testimony, in May of 2012, Kinney and Jowers exchanged e-mails where Kinney explains: "To be very clear, there is at this point no agreement to pay you 60% commissions. You stop at 50%. This is critical to the purposes we set that system up for. If you don't trust you will get a fair bonus, we can change your deal but you won't be able to write off expenses to the same degree." ROA. 9929-9930.

Jowers then executed a Security Agreement, $150,000 promissory note, and a "Loan Agreement (Revolving Line of Credit)" in favor of Counsel Unlimited LLC dated October 15, 2012, November 1, 2012, and December 29, 2012, respectively. ROA.8023-8044, ROA.7998-8003, ROA.8004-8022. The interest rate under the November 12, 2012 promissory note is 17%. ROA.7998.

In April of 2015, Kinney and Jowers exchanged written communications which referenced Jowers's upcoming June 2015 move to Hong Kong. ROA.9931-9933.

Regarding Jowers's move to Hong Kong, in June of 2015, Above the Law published a press release with MWK's authorization that states in material part:

> Evan Jowers has finally taken the plunge and ***moved to Hong Kong on a permanent basis***. Since '06, Evan has been head of Kinney's Asia recruiting and over that time Kinney has easily placed more US associates, counsels and partners at top tier US and UK firms than any other recruiting firm (we have also made many in-house placements).
>
> Evan will be living and ***working out of the Four Seasons Place in Central for the convenience of our clients. We have a conference room facility there*** for extra discreet meetings, although most of Evan's individual attorney client meetings will continue to be at Blue Bar (as has been the case over the years) down in the Four Seasons lobby.
>
> ***Now that Evan is in Hong Kong full time***, he will be more readily available to meet with and advise in-person our law firm and individual attorney clients in Hong Kong.

ROA.9984-9985, ROA.12467-12469 (e.s.).

Although MWK touted that Jowers would be working out of the Four Seasons, it refused to pay for that expense. ROA.12055.

On June 13, 2015, Kinney e-mailed the following message to Jennifer Tan at Heng-Tan: "Evan Jowers, who works with us, is going to be moving to Hong Kong in the near future. He's a US citizen. Can your firm help me get a work visa for Evan or do I have to go elsewhere for that?" ROA.10019. On June 15, 2015, Kinney requested forms from Heng-Tan related to Jowers's

work visa application, and advised he wished to appoint them to "apply for the visa[.]" ROA.10018-10019. Heng-Tan relayed the visa forms to Kinney with instructions by e-mail on June 16, 2015. ROA.10018.

On August 8, 2015, Kinney sent those forms to Heng-Tan in draft with copies of the "employment and business plan also in draft[.]" ROA.10015. Kinney's draft employment agreement for Jowers was subject to Hong Kong law. ROA.12291-12294, ROA.10165-10175. With respect to the draft Jowers Hong Kong Employment Agreement, Kinney explained at trial that under Hong Kong law, restrictive covenants are "enforceable is my understanding, but they function differently. You have the garden leave concept, and you have to pay the person a certain amount to keep them there." ROA.12293.

Thereafter, Jowers and Heng-Tan coordinated to complete certain Hong Kong work visa-related tasks, and Heng-Tan followed up with Kinney on certain requested documents needed to proceed with the application, including an "Employment agreement duly signed by both parties." ROA.10002. On August 21, 2015, Kinney e-mailed Heng-Tan with a cc to Jowers that the requested documents would be e-mailed "next week." ROA.10002. Jowers followed up with Kinney by e-mail August 30, 2015 pleading "please try to get this done this week" because he would "need a work visa to stay here. Need health insurance and other stuff as well." ROA.10012. Kinney responded: "Yes! Top Priority!" ROA.10012.

In response to an August 31, 2015 e-mail from Heng-Tan asking "when the required documents as per the below email will be available for

forwarding to the immigration Department," Kinney responded by e-mail with a cc to Jowers that "I am flying into Hong Kong tonight. I'll get back to you first thing tomorrow. I want to handle it this week." ROA.10023. But he did not.

On September 7, 2015, further e-mails were exchanged regarding Jowers's Hong Kong work visa between Kinney and Heng-Tan with a cc to Jowers. ROA.10034.

By October of 2015, the work visa application still had not been done, and when Jowers e-mailed Heng-Tan about the status of his work visa application, he was advised "we are still waiting for the documents from [Kinney]." ROA.10059. Jowers then sent Kinney several e-mails regarding the status of the application, and shared with Kinney "[w]ithout a work visa I shouldn't really be here in [Hong Kong] this long. I am without health insurance also since I left US. Not smart for a 44 year old." ROA.10107, ROA.10046, ROA.10076.

On November 3, 2015, nearly five months after MWK's Above The Law press release, Kinney advised Jowers "I don't see how we will be in a position to apply before I am there but I am working on it." ROA.10106. By this time, Jowers had been in Hong Kong working for Kinney without a visa for nearly five months, despite the above-described communications from Kinney. ROA.9984-10127, ROA.10129-10144.

On November 11, 2015, Kinney forwarded to a business partner and family member an e-mails from Jowers describing some of the hardships

caused by his lack of a work visa. ROA.10128. In his forwarding e-mail, Kinney says of Jowers "that guy is crazy and considers himself a hero." ROA.10128.

On March 24, 2016, Jowers sent Kinney an e-mail with the title "Can we move forward with work visa next week?" ROA.10145. Kinney responded "Yeah, let's get that taken care of. Probably can just aim to get it all signed up and filed when I am in Hong Kong." ROA.10145. By this time, Jowers had been in Hong Kong working for Kinney without a visa for approximately nine months, despite the above-described communications from Kinney. ROA.9984-10145.

Kinney testified at trial that during Jowers's time in Hong Kong, the Four Seasons was Jowers's "residence," the income generated from the placements was billed by Kinney HK, and Jowers's salary was paid by Kinney Recruiting, LLC. ROA.12248-12250. Kinney required Jowers to cover some or all of the cost of the Four Seasons from his share of the commission compensation because he "didn't feel it was reasonable and necessary." ROA.12248-12249.

During this time, Jowers continued to perform recruiting services, and was in touch with a number of candidates, including Steve Kang, James Chang, Rose Zhu, Pamala Usukumah, Longhao Wang, and Meng Ding. ROA.10323-10326. Jowers does not dispute the lower court's "Summary of the Evidence" regarding placements made by him, his current business

partner Alejandro Vargas, or entities affiliated with Jowers. ROA.10329-10331.

On December 16, 2016, after working approximately 18 months in Hong Kong without Kinney taking "any steps to support" Jowers in obtaining a work visa, Jowers resigned from MWK. ROA.12091-12092, ROA.12301. During a post-resignation e-mail exchange between Jowers and Kinney in late December of 2016, Kinney came clean about the work visa situation:

> The noncompete would have been harder to make stick under Hong Kong law, and that was one of my hang ups about it when it became clear that in your mind you were not working for the group but rather for the Evan Jowers show. That's why you remained a Florida employee all year."

ROA.10146.

The underlying lawsuit was filed roughly three months later, before many of the placements which are the subject of this action occurred. ROA.70-209.

## SUMMARY OF THE ARGUMENT

Simply, it was error to enter judgment for MWK on its trade secret misappropriation and breach of employment agreement restrictive covenant counts.

With regard to the misappropriation counts, MWK failed to adequately plead or prove that any career-related information possessed by MWK pertaining to six potential candidates was a "trade secret." In its pleadings, MWK labels this information a "trade secret" while simultaneously failing to provide any support for its legal conclusion and admitting that certain information in its possession was "available to any member of the public who cares to look at publicly available information." ROA.1717, ROA.1719. At the summary judgment stage, it failed to even aver that the six potential candidates' information was not "readily ascertainable through proper means" as required by the applicable statutory definitions of trade secret. The reason for the failure became apparent at trial, when MWK failed to call any potential candidates to substantiate its claim, and admitted there is nothing that prevents these individuals from sharing their career-related information with others. ROA.12231.

MWK's breach of restrictive covenant count is similarly flawed. Applicable Florida law obligates MWK to "plead and prove" a "legitimate business interest," and that its restrictive covenant is "reasonably necessary" to protect that interest. Fla. Stat. § 542.335(1). The only statutorily-recognized "legitimate business interest" which MWK arguably alleged its

restrictive covenants were "reasonably necessary" to protect was its trade secret. But as discussed in the prior paragraph, MWK failed to properly demonstrate that career-related information pertaining to candidates was a "trade secret." Accordingly, this count should fall with the misappropriation of trade secret counts.

There is another reason why the breach of restrictive covenant count should fail—MWK has unclean hands. The evidence at trial shows that ten years before his resignation, Jowers was required to execute the Jowers Employment Agreement with a non-solicitation provision. That agreement makes no mention of Asia. A few years later, the percentages applicable to Jowers's commission-based compensation plan were decreased against his favor. Jowers was then caused to contribute to the marketing expenses related to his efforts to develop business in Asia (potentially via employer loans with a 17% interest rate). After Jowers developed business in Asia, MWK opportunistically publicized Jowers's move to Hong Kong to further its Asia business while failing for **18 months** to take necessary steps to procure the requisite work visa. E-mails from MWK's principal indicate the failure to procure the necessary work visa was not an oversight—it was deliberate to avoid what he understood as a Hong Kong law requirement that Jowers be paid "garden leave" as a condition of enforcing the restrictive covenants. Jowers suffered damage as a result of MWK's inequitable conduct. The judgment should be reversed.

<u>**ARGUMENT**</u>

I.    <u>**Standard of Review**</u>

A.    **Motion to Dismiss**

This Court applies a de novo standard of review to district court rulings on motions to dismiss. <u>National Horsemen's Benevolent and Protective Association v. Black</u>, 53 F.4th 869, 878 (5th Cir. 2022). To proceed past the pleading stage, a plaintiff must allege sufficient factual matter which, if accepted as true, would state a claim for relief that is plausible on its face. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009); <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). But, "unadorned, the-defendant-unlawfully-harmed-me accusations" are not enough. <u>Iqbal</u>, 556 U.S. at 678. Similarly, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 555). (internal quotes omitted). Neither will "naked assertions devoid of further factual enhancement." <u>Id.</u> (internal quotes and brackets omitted).

Rather, courts are only required to accept as true "well-pleaded" facts alleged in the complaint. <u>Papasan v. Allain</u>, 478 U.S. 265, 283 (1986); <u>Greene v. Greenwood Pub. Sch. Dist.</u>, 890 F.3d 240, 242 (5th Cir. 2018). To be "well pleaded," a complaint must state specific facts to support the claim, not mere conclusions couched as factual allegations. <u>Iqbal</u>, 556 U.S. at 679; <u>Tuchman v. DSC Comm. Corp.</u>, 14 F.3d 1061, 1067 (5th Cir. 1994); <u>Lormand v. US Unwired, Inc.</u>, 565 F.3d 228, 244 (5th Cir. 2009).

B.    **Motion for Summary Judgment**

This Court also applies a de novo standard of review to district court rulings on motions for summary judgment. Black, 53 F.4th at 878. Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact dispute is 'genuine' if 'a reasonable jury could return a verdict for [the nonmovant] based on the evidence.' " Rogers v. Jarrett, 63 F.4th 971, 975 (5th Cir. 2023) (quoting Coleman v. BP Expl. & Prod., Inc., 19 F.4th 720, 726 (5th Cir. 2021)). A fact is "material" if, under substantive governing law, it "might affect the outcome of the suit[.]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion," and can do so by identifying any relevant summary judgment evidence which demonstrates the absence of a genuine issue of material fact[.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). But there is no "requirement that a movant negate the opponent's claim." Id. Rather, where the nonmovant bears the ultimate burden of proof, it "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Johnson v. Cooper T. Smith Stevedoring Co., Inc., 74 F.4th 268, 272 (5th Cir. 2023) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

While inferences "must be viewed in the light most favorable to the party opposing the motion," mere "conclusory allegations" and

"unsubstantiated assertions" are insufficient to defeat summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Johnson, 74 F.4th at 272.

## C.    Bench Trial

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo." Luwisch v. Am. Marine Corp., 956 F.3d 320, 326 (5th Cir. 2020) (internal quotes omitted). With regard to findings of fact, this Court "will upset the district court's findings of fact only if we are left with the definite and firm conviction that a mistake has been committed," and applies "a strong presumption that the court's findings must be sustained even though this court might have weighed the evidence differently."" Id. (internal quotes omitted).

## II.    MWK's trade secret misappropriation judgment under Texas and federal law should be reversed.

The Federal Defense of Trade Secret Act (the "DTSA") defines "trade secret" as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) *the information derives independent economic value*, actual or potential, *from* not being generally known to, *and not being readily ascertainable through proper means* by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3) (e.s.).

Similarly, the Texas Uniform Trade Secret Act ("TUTSA") defines "trade secret" as:

[A]ll forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:

(A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

(B) the *information derives independent economic value*, actual or potential, *from* not being generally known to, *and not being readily ascertainable through proper means* by, another person who can obtain economic value from the disclosure or use of the information.

Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6) (e.s.).

When the appropriate standard of review is applied to the record below, it becomes apparent that MWK should not have been awarded damages on its trade secret misappropriation claims. Reversal is appropriate.

### A. MWK's second amended complaint did not adequately plead the requisite trade secret under Texas and federal law.

MWK's misappropriation of trade secret claim was alleged against both Jowers and his co-defendant (and ex-wife), Yuliya Vinokurova. ROA. 1716-1721. While it proceeded past the pleading stage as alleged against Jowers, it was dismissed as alleged against Vinokurova for failure to state a claim. ROA.2052-2082.

The lower court's stated reason for the disparate treatment is MWK's detailed misappropriation allegations related to the following alleged "trade secret" (at ¶ 61 of the *Second Amended Complaint*):

> In particular, while employed with MWK, Jowers obtained MWK confidential trade secret information concerning the following MWK candidates: James Chang, Longhao Zhang, Richard Han, Pamela U, Claudia Lau, and Xiao Zhang (the "MWK Candidates.")[.]

ROA.1699.

While that paragraph is supposed to describe the specific "trade secrets" which are the subject of MWK's misappropriation claims against Jowers, it provides no facts from which the purported "trade secret" information about the "MWK Candidates" can be gleaned. Is the purported "trade secret" the unspecified "relevant information about MWK's clients and candidates" that MWK readily admits at ¶¶ 137 and 147 is "available to any member of the public who cares to look at publicly available information"? ROA.1717, ROA.1719. Or is it something else?  MWK's *ipse dixit* contention that certain unspecified information regarding the "MWK

Candidates" is a trade secret is insufficient to properly plead the trade secret which Jowers purportedly misappropriated, especially since MWK readily admits that certain information about its clients and candidates "is available to any member of the public who cares to look at publicly available information[.]" ROA.1717, ROA.1719.

Simply put, not every secret is a trade secret. As this Court announced nearly 40 years ago, "That which is readily visible and ascertainable cannot constitute a trade secret." Interox Am. v. PPG Indus., Inc., 736 F.2d 194, 201 (5th Cir. 1984). As a result, "A customer list of readily ascertainable names and addresses will not be protected as a trade secret." Guy Carpenter & Co. v. Provenzale, 334 F.3d 459, 467 (5th Cir. 2003). Similarly, "An item or process of public or general knowledge in an industry cannot be appropriated by one as his own secret." Cataphote Corp. v. Hudson, 422 F.2d 1290, 1293 (5th Cir. 1970).

With regard to the specific alleged trade secrets which were purportedly misappropriated by Jowers (but not Vinokurova), the final iteration of MWK's complaint failed to provide any factual information to substantiate MWK's allegation that unspecified information regarding the "MWK Candidates" was, in fact, trade secret. Having given MWK several attempts to plead this claim, the trial court should have dismissed these counts as alleged against Jowers (as it did with respect to Vinokurova). ROA.1686-1721, ROA.1975-1979, ROA.2070-2075. The judgment should be reversed.

**B.    In the alternative, judgment as a matter of law should have been entered on the trade secret misappropriation claims under Texas and federal law.**

By statute, in order for secret information to qualify as a trade secret, it must derive independent value "from not being generally known to, ***and*** not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3) (e.s.); Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6) (e.s.). Simply, MWK failed to come forward with sufficient evidence on this material issue.

The record does not contain any testimony from any of the six "MWK Candidates" whose career-related information was the subject of the misappropriation of trade secret counts. As a result, we do not know whether these six individuals spoke with or shared some or all of their career-related information with any other recruiters, or would have shared this information with any other recruiters if asked. Accordingly, there is no way to confirm that this information was both "not generally known" and not "readily ascertainable through proper means."

The only "evidence" which MWK presented on these critical matters was its own self-serving averment in its declaration in opposition (at ¶76) that "the information shared by Jowers about the candidates listed above, was not generally known to other recruiters." ROA.13514. There are two reasons why this averment is insufficient to establish a trade secret at the summary judgment stage. First, it is exactly the type of "conclusory allegations" and

"unsubstantiated assertions" which the U.S. Supreme Court has instructed are insufficient to defeat summary judgment. <u>Matsushita Elec.</u>, 475 U.S at 587.

Second, and perhaps more importantly, ***MWK fails to aver that this information is not readily ascertainable through proper means***. Thus, there is no record evidence that these six individuals' career-related information was a "trade secret," i.e. that it derived value from "not being generally known to, ***and not being readily ascertainable through proper means[.]***" 18 U.S.C. § 1839(3) (e.s.); Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6) (e.s.). This was a failure of proof in MWK's prima facie case on the trade secret claims, and further warrants reversal.

### C. MWK failed to demonstrate at trial that any purportedly misappropriated information was a trade secret.

MWK's trial presentation suffered from the same defect as its summary judgment evidence. MWK relied on its principal to try to demonstrate that the information it possessed about its candidates or potential candidates were "trade secret." It again failed to present any testimony from any of its candidates or potential candidates as to whether or not their career-related information was, in fact "not generally known" and not "readily ascertainable through proper means." ROA.12019, ROA.12265.

There was no testimony that the six specific potential candidates which are the subject of this claim were required to work exclusively with MWK, or were prohibited from sharing their information with any other

recruiters, or would have refrained from sharing their information with any other recruiters. To the contrary, MWK's principal admitted MWK does not require candidates to sign non-disclosure agreements, and there is nothing that prevents these individuals from sharing their career-related information with others. ROA.12231. MWK's failure of proof on this matter is fatal to its trade secret misappropriation claims.

On this point, Quality Sys., Inc. v. Warman, 132 F. Supp. 2d 349, 356 (D. Md. 2001) is instructive. In Warman, a government contractor that recruited personnel for various agencies asserted trade secret misappropriation and other claims against a number of its employees for allegedly misappropriating a recruiting database that contained resumes obtained from thousands of applicants, headhunters, and Internet sites. Id. at 351-52. The Warman court entered summary judgment against the plaintiff recruiter, and noted that one of the "fatal flaws" of the claim was that most, if not all, of the information "fail to meet the statutory definition of a trade secret because they are readily ascertainable by other means." Id.[4] at 356.

---

[4] The applicable statutory definition in Warman was provided by the Maryland Uniform Trade Secret Act, and reads:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
>> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

Another fatal flaw was that, although the lawsuit was filed approximately one month after the lead defendant resigned (see id. at 352), the recruiter's counsel conceded "the information no longer has any continuing economic value." Id. at 356.

Like the potential candidate list in Warman, MWK's potential candidate list is not a trade secret. The lower court should have concluded that there was insufficient proof of a misappropriated trade secret. The judgment should be reversed.

### III.    **MWK's breach of Employment Agreement restrictive covenants judgment under Florida law should also be reversed.**

Under applicable Florida law, a party seeking to enforce a restrictive covenant must: (i) "plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant," and (ii) "plead and prove that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction." Fla. Stat. § 542.335(1)(b) & (c).[5]

---

        (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Md. Code Ann., Com. Law § 11-1201(e).

[5] Ironically, if MWK and Jowers were providing legal services, as opposed to legal recruiting services, the subject restrictive covenant would be unethical. Cf., RESTRICTIONS ON RIGHT TO PRACTICE, MRPC RULE 5.6(a) ("A lawyer shall not participate in offering or making: (a) a partnership, shareholders, operating, employment, or other similar type of agreement

Preliminarily, and remarkably, *nowhere* in the *Second Amended Complaint* does MWK allege that the restrictive covenants were "reasonably necessary" to protect a "legitimate business interest" as required by statute. ROA.1686-1732. The closest that MWK comes to alleging its restrictive covenants are "reasonably necessary" to protect a statutorily-recognized "legitimate business interest" is at ¶¶ 138 and 148 of its operative complaint, which are found in MWK's trade secret counts. Those paragraphs provide:

> MWK uses ***efforts*** that are ***reasonable*** under the circumstances to protect its ***trade secret*** information. MWK's databases, maintained from its headquarters in Austin, Texas, are password protected and utilize the latest security technology. Each employee and contractor of MWK is subject to confidentiality agreements, and MWK ***protects*** its trade secret information ***when necessary*** through legal action.

ROA.1717, ROA.1720 (e.s.).

If the Court were to give MWK the benefit of the doubt and construe these allegations as meeting the "reasonably necessary" pleading requirement, then it should limit its analysis of whether there is a sufficient "legitimate business interest" to the only statutorily-recognized "legitimate business interest" referenced in these paragraphs—trade secrets.[6] Thus, MWK should not be able to contend that the Employment Agreement

---

that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement[.]").

[6] As with MWK's trade secret counts, the lower court dismissed the breach of restrictive covenants count as alleged against Vinokurova, but not Jowers. ROA.2075-2079.

restrictive covenants were "reasonably necessary" to protect any other statutorily-recognized "legitimate business interests".[7]

### A. Summary judgment should have been entered on the breach of Employment Agreement restrictive covenant claim under Florida law.

As noted above, applicable Florida law *requires* parties which seek to enforce restrictive covenants, like MWK, to plead and prove one or more "legitimate business interests" justifying the restrictive covenant, and that the specific restrictive covenants are "reasonably necessary" to protect that "legitimate business interest." Also, as noted above, the only "legitimate business interest" which was (arguably) properly alleged by MWK is its purported trade secrets. But remarkably, nowhere in the 24-page, 103-paragraph declaration MWK filed in opposition to Jowers's summary judgment motion does MWK aver that, or explain why, the subject restrictive covenants are "reasonably necessary" to protect its alleged trade secret "legitimate business interest." ROA.13497-13520.

MWK's declaration in opposition to summary judgment also makes no attempt to describe any purported trade secrets beyond the career-related information of the six individuals who are the subject of its misappropriation of trade secrets claim. ROA.13497-13520. Accordingly, the restrictive

---

[7] This is consistent with the lower court's ruling on matters which it determined were not properly placed at issue in the pleadings. See e.g., ROA.13658-13661 (rejecting Jowers's defense that the liquidated damages provision in the Employment Agreement was an unenforceable penalty without reaching its merits).

covenants count is dependent on, and rises and falls with, the MWK's contention that the career-related information of six individuals is a "trade secret." But for the reasons discussed above in Section II.B., MWK failed to properly demonstrate with evidence that the career-related information of those six individuals is, in fact, a "trade secret." Accordingly, this count fails too. Summary judgment should have been granted in Jowers's favor on MWK's breach of Employment Agreement restrictive covenants count.

> **B.**    **MWK's failure to demonstrate at trial the alleged "legitimate business interest" that the restrictive covenant was purportedly "reasonably necessary" to protect should have been fatal to its breach of Employment Agreement restrictive covenants claim.**

As discussed in Section III above, the only "legitimate business interest" which MWK's pleadings suggest the Employment Agreement restrictive covenant was "reasonably necessary" to protect was trade secret. But as discussed in Section II.C. above, MWK failed to present sufficient evidence at trial that any career-related information of its candidates was a trade secret. That failure of proof should have precluded MWK from enforcing the Employment Agreement restrictive covenants against Kinney. Fla. Stat. § 542.335(1)(b) & (c). The lower court should have entered final judgment for Jowers on MWK's breach of Employment Agreement restrictive covenant count.

## IV.    <u>MWK's unclean hands defeat its breach of employment agreement restrictive covenants claim.</u>

"In determining the enforceability of a restrictive covenant, a court: * * * Shall consider all other pertinent legal and equitable defenses." Fla. Stat. § 542.335(1)(g)3. Generally, "[u]nclean hands is an equitable defense that is akin to fraud; its purpose is to discourage unlawful activity." Proino Breakfast Club, II, Inc. v. OGI Cap., Inc., 331 So. 3d 846, 848 (Fla. Dist. Ct. App. 2021) (internal quotes omitted). "In order to constitute unclean hands, conduct must generally be connected with the matter in litigation and must affect the adverse party." Id. (internal quotes omitted). Unclean hands has been applied to bar enforcement of Florida restrictive covenants. See e.g., Bradley v. Health Coal., Inc., 687 So. 2d 329, 334 (Fla. Dist. Ct. App. 1997).

Jowers pled this affirmative defense in his operative pleading. ROA.5930. As discussed below, he also presented significant, credible evidence of unclean hands at trial. The lower court should have analyzed this defense, and entered judgment in Jowers's favor.

The 2006 Employment Agreement containing the restrictive covenants has a number of noteworthy features. First, it had an "Exhibit A" which provided that Jowers would be paid 65% of collected commissions on amounts exceeding $300,000. ROA.7983. It also contained a liquidated damages for breach of restrictive covenants clause that could charitably be described as onerous (§§9.1-9.6.).[8] ROA.7979-7980. There was also a

---

[8] Specifically, it was construed to require Jowers to pay MWK 100% of whatever commission was paid for a placement made in violation of the covenants *regardless* of what Jowers received. This would amount to a windfall for MWK, as MWK would never receive more than 55% of any

provision (¶2.2) that required MWK to "pay all of the usual and ordinary expenses involved in the operation of the Office." ROA.7976.

Having procured the covenants, over the next few years, MWK went about changing the monetary terms to Jowers's detriment. It cut the top-line commission percentage down substantially, by capping it at 45% across-the-board, and then capping it at 50% (although Jowers testified that an unwritten bonus structure was in place that would allow him to receive 60% over $300,000). ROA.9923-9927, ROA.12460, ROA.12084-12085, ROA.12369-12370, ROA.12456. Even accepting Jowers's forthright testimony regarding an unwritten 10% bonus, his topline commission percentage was still 5% less than what was provided for by "Exhibit A" to the Employment Agreement containing the restrictive covenants.

But that was not the only way in which MWK materially altered the terms of Jowers's employment to his detriment post-restrictive covenant. MWK also passed along a portion of its marketing expenses to Jowers. ROA.9954, ROA.12084.

And that was still not enough for MWK. To the extent that Jowers needed to finance any business expenses, the record reflects that at least part of those expenses were financed at 17% interest via a promissory note,

---

commission generated by its recruiter. ROA. 7975-7985. Jowers sought to challenge the liquidated damages provision as an unconscionable penalty before the lower court (based on Coleman v. B. R. Chamberlain & Sons, Inc., 766 So. 2d 427, 429 (Fla. Dist. Ct. App. 2000)), but was precluded from doing so on procedural grounds. ROA.10353.

security agreement, and revolving line of credit in favor of MWK. ROA.8023-8044, ROA.7998-8003, ROA.8004-8022.

As unsavory as all of the above might be, it pales in comparison to MWK's conduct when Jowers moved to Hong Kong to advance MWK's interests. Specifically, while MWK opportunistically used Jowers's move and use of the Four Seasons as his base of operations to market MWK's services, MWK refused to pay for the Four Seasons, and **took no "steps" to procure the work visa Jowers needed to remain there legally.** ROA.9984-9985, ROA.12165, ROA.12301, ROA.12467-12469.

Instead, for nine months, MWK engaged in activity designed to make it *seem* like MWK was taking steps to procure Jowers's necessary work visa. ROA.9984-10145. But in fact, as evidence at trial revealed, MWK *intentionally* failed to procure the work visa so as to avoid updating Jowers's Employment Agreement to make it compliant with Hong Kong law. Based on MWK's experience with prior Hong Kong employee Alexis Lamb, MWK knew "[t]he noncompete would have been harder to make stick under Hong Kong law," and would require "garden leave" payments to Jowers as a condition of enforcement. ROA.10146, ROA.12293, ROA9966-9979. Complying with immigration law would have cost money, so MWK refused to do so—at Jowers's peril. [9]

---

[9] One cannot help but wonder whether abuses like these are the reason why the FTC has proposed a rule change that would ban nationwide non-competes and restrictive covenants that function as non-competes. See [proposed] Federal Trade Commission Rule §§ 910.1, 910.2, & 910.4 (which

When Jowers became aware of the issue with his immigration status, he was in a panic. ROA.12466. He feared he would be arrested. ROA.12496. He also suffered financial consequences, and difficulty obtaining health insurance. ROA.10128. After 18 months of living in fear and panic under threat of arrest in a foreign country, Jowers finally left MWK. ROA.12463, ROA.12165.

All of the foregoing damaged Jowers immensely with respect to the subject matter of this litigation. He was deprived of approximately 5% (or more) of the compensation contemplated by the "Exhibit A" attached to the Employment Agreement containing the restrictive covenants. For 18 months, he worked for MWK under threat of arrest in a foreign country because MWK feigned efforts to procure the necessary work visa. Had MWK followed through on the work visa and entered into a Hong Kong law-compliant employment agreement with Jowers, it would have to make "garden leave" payments to Jowers to enforce the restrictive covenants which are the subject of this action.

Jowers pleaded for his visa situation to be remedied so that he would be able to obtain health insurance, avoid financial impacts, and work legally in Hong Kong. ROA.10128. But his pleas were not only disregarded; they

_____

would amend the Code of Federal Regulations to add 16 C.F.R. §§ 910.1, 910.2, & 910.4). https://www.ftc.gov/legal-library/browse/federal-register-notices/non-compete-clause-rulemaking.

were derided internally by MWK as being made by a "crazy" person. ROA.10128.

Jowers's unclean hands affirmative defense was properly pled, anticipated by the parties in their pretrial submissions, and supported by significant trial testimony and documentary evidence. It was error to rule against Jowers on this defense. MWK's judgment on the breach of Employment Agreement restrictive covenants count should be reversed.

## CONCLUSION

Jowers respectfully requests that the Honorable Court reverse the *Amended Final Judgment* and remand with instructions to enter a judgment for him on MWK's trade secret misappropriation counts (Counts I and II of the *Second Amended Complaint*) and breach of contract (restrictive covenants) count (Count III).

Respectfully submitted,

s/ Richard N. Asfar
Richard N. Asfar
*Counsel for Appellant Evan P. Jowers*

**OF COUNSEL**:
Almazan Law
515 W. Bay Street, Suite 515
Tampa, FL 33606
(305) 665-6681
(305) 665-6684 (fax)
rasfar@almazanlaw.com

## CERTIFICATE OF SERVICE

I served on September 15, 2023, by means of electronic mail, a true and correct copy of this brief on the following counsel of record:

Martin J. Siegel, Esq.
2222 Dunstan Road
Houston, TX 77005
281.772.4568
martin@siegelfirm.com

s/ Richard N. Asfar
Of Counsel

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 8,596 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using 14-point Equity B font (installed after the 2021 updates resulting in the post-update version of "Equity B" being identical to the pre-update version of "Equity Text B").

Dated: September 15, 2022.

s/ Richard N. Asfar
Of Counsel