No. 22-50936

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

MWK RECRUITING INCORPORATED,

Plaintiff-Appellee,

v.

EVAN P. JOWERS,

Defendant-Appellant.

On Appeal from the United States District Court
for the Western District of Texas

**PLAINTIFF-APPELLEE'S BRIEF**

Martin J. Siegel
LAW OFFICES OF
    MARTIN J. SIEGEL, P.C.
2222 Dunstan Road
Houston, Texas 77005
Telephone: (281) 772-4568

*Attorney for Plaintiff-Appellee*

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

MWK RECRUITING INCORPORATED,

Plaintiff-Appellee,

v.

EVAN P. JOWERS,

Defendant-Appellant.

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Appellant, prior parties, and affiliated persons and entities:

Jowers, Evan P.
Lamb, Alexis Carla
Legis Ventures Co Ltd.
Vargas, Alejandro
Vinkurova, Yuliya

Counsel for Appellant:

    Adams & Reese, LLP
    Almazan Law
    Asfar, Richard
    Brookhout, James
    Cole, Kevin J.
    DLA Piper, L.L.P.
    Katz, Marc
    KJC Law Group
    McLeod, Aaron
    Stefanova, Marina
    Tauler, Robert
    Tauler Smith, L.L.P.

Appellee and affiliated persons and entities:

    Counsel Holdings
    Counsel Unlimited
    Kinney, Robert Everett
    Kinney Michelle Weber
    Kinney Recruiting, L.L.C.
    Kinney Recruiting Ltd.
    MWK Recruiting, Inc.
    Recruiting Partners GP, Inc.

Counsel for Appellee:

    Daignault Iyer, L.L.P.
    Ellis, Zachary
    Loanzon, Tristan
    Loanzon, L.L.P.
    Mort, Raymond III
    Mort Law Firm, P.L.L.C.
    Siegel, Martin J.
    Law Offices of Martin J. Siegel, P.C.

s/    *Martin J. Siegel*
Martin J. Siegel
*Attorney of Record for Plaintiff-Appellee*

# STATEMENT REGARDING ORAL ARGUMENT

Oral argument isn't warranted in this case. Defendant-Appellant's appeal is very circumscribed. Once complaints about dispositive pretrial motions are disregarded – they are unreviewable, since the case was tried on the merits – only one point attacking a judgment against him for misappropriating trade secrets remains. That argument, which claims the district court clearly erred in finding the relevant secrets not generally known or readily ascertainable, doesn't raise novel or difficult legal questions. It also runs headlong into the court's lenient review of factual findings following bench trials. Oral argument therefore isn't necessary for this Court to consider and resolve it.

Defendant-Appellant also appeals a judgment against him for breach of contract, but here too, his main point is insubstantial because it has been waived. More than that, it relies on a defense, unclean hands, that applies only in equitable actions – not suits for damages like this one. Argument on this aspect of the appeal would therefore also be gratuitous.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................................. i

STATEMENT REGARDING ORAL ARGUMENT ................................................... iii

TABLE OF CONTENTS ................................................................................. iv

TABLE OF AUTHORITIES ............................................................................ vii

STATEMENT OF JURISDICTION .................................................................... xiii

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................................... xiv

INTRODUCTION ............................................................................................ 1

STATEMENT OF THE CASE ............................................................................. 3

    I.       Factual Background ................................................................. 3

          A.     Jowers's Employment Agreement ..................................... 3

          B.     Jowers's Theft and Use of MWK's Trade
                 Secrets and Confidential Information, and His
                 Competition with MWK .................................................. 8

                 1.     Steve Kang ..................................................... 11

                 2.     Pamela Usukumah........................................... 13

                 3.     Meng Ding ..................................................... 13

                  4.     Longhao Wang ................................................ 14

                  5.     Rose Zhu ........................................................ 14

                  6.     James Chang ................................................... 15

          C.     Jowers's Compensation, High Spending, Loans,
                 and Desire for a Hong Kong Work Permit .................... 16

II.     Procedural History ....................................................22

SUMMARY OF THE ARGUMENT ......................................................25

ARGUMENT......................................................................28

I.     Following a Bench Trial, the Court Reviews the
District Court's Factual Findings for Clear Error,
and its Legal Conclusions De Novo..........................................28

II.     The Judgment Against Jowers for Misappropriation
of Trade Secrets Should Be Affirmed......................................29

     A.     Jowers's Complaints About the District Court's
Decisions Under Rules 12(b)(6) and 56 Are Not
Reviewable....................................................................29

     B.     The District Court's Judgment Should Be
Affirmed Because its Factual Finding that MWK's
Trade Secrets Were Not Generally Known or
Readily Ascertainable Is Not Clearly Erroneous..........33

          1.     Applicable Principles of Trade Secrets Law ........34

          2.     The District Court's Factual Finding on
the "Not Generally Known or Readily
Ascertainable" Element Is Not Clearly
Erroneous...........................................................36

III.     The Judgment Against Jowers for Breach of the
Employment Agreement Should Also Be Affirmed................46

     A.     The Court Cannot Review the District Court's
Summary Judgment Order ............................................46

     B.     The Restrictive Covenants Properly Protected
MWK's Legitimate Business Interests as
Defined in Florida Law.................................................48

  C. Jowers's Unclean Hands Defense Has
    Been Waived and Is Meritless Anyway ........................50

CONCLUSION ...................................................................................57

CERTIFICATE OF SERVICE ...............................................................58

CERTIFICATE OF COMPLIANCE........................................................59

# TABLE OF AUTHORITIES

**Cases**                                                   **page:**

*Academy of Allergy & Asthma in Primary Care v.*
*Quest Diagnostics, Inc.,*
   998 F.3d 190 (5th Cir. 2021) ....................................................34

*Ahern Rentals, Inc. v. EquipmentShare.com, Inc.,*
   59 F.4th 948 (8th Cir. 2023) ..........................................................35

*Alliantgroup, L.P. v. Feingold,*
   803 F. Supp. 2d 610 (S.D. Tex. 2011) ......................................45

*Allstate Ins. Co. v. Fougere,*
   79 F.4th 172 (1st Cir. 2023) ........................................................35

*A.M. Castle & Co. v. Byrne,*
   123 F. Supp. 3d 909 (S.D. Tex. 2015) ......................................45

*Anderson v. City of Bessamer City,*
   470 U.S. 564 (1985) ..................................................................28

*AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.,*
   663 F.3d 966 (8th Cir. 2011), *cert. denied*, 568 U.S. 817 (2012) .............41

*Baxter Assoc., L.L.C. v. D&D Elevators, Inc.,*
   2017 WL 604043 (Tex. App. – Dallas 2017) ...........................45

*Becker v. Tidewater,*
   586 F.3d 358 (5th Cir. 2009) ...............................................31, 32

*Bennett v. Pippin,*
   74 F.3d 578 (5th Cir.), *cert. denied*, 519 U.S. 817 (1996) ........................29

*Bimbo Bakeries, USA, Inc. v. Sycamore,*
   39 F.4th 1250 (10th Cir. 2022) ..................................................41

*Black v. J.I. Case Co., Inc.,*
   22 F.3d 568 (5th Cir.), *cert. denied*, 513 U.S. 1017 (1994) ......................31

*Blessey Marine Serv., Inc. v. Jeffboat LLC*,
    771 F.3d 894 (5th Cir. 2014) ................................................................31, 32

*Bodemer v. Swanel Beverage, Inc.*,
    884 F. Supp. 2d 717 (N.D. Ind. 2012) ......................................................42

*Bradley v. Health Coalition, Inc.*,
    687 So. 2d 329 (Fla. Dist. Ct. App. 3rd Dist. 1997) ..................................53

*Brumfield v. Cain*,
    808 F.3d 1041 (5th Cir. 2015), *cert. denied*, 578 U.S. 1023 (2016) ..........28

*CAE Integrated, L.L.C. v. Moov Tech., Inc.*,
    44 F.4th 257 (5th Cir. 2022) ...............................................................35, 41

*Carlmont Cap. Special Purpose Corp. II v. Anderson*,
    285 F. App'x. 185 (5th Cir. 2008) .............................................................30

*Castellano v. Fragozo*,
    311 F.3d 689, 700 (5th Cir. 2002), *vacated on other grounds*,
    352 F.3d 939 (5th Cir. 2003) (en banc),
    *cert. denied*, 543 U.S. 808 (2004) ..........................................................30

*Cloud v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*,
    83 F.4th 423 (5th Cir. 2023) .....................................................................28

*Computer Assoc., Int'l, Inc. v. Altai., Inc.*,
    918 S.W.2d 453 (Tex. 1996) .....................................................................34

*Congress Park Ofc. Condos II, LLC v.
First-Citizens Bank and Trust Co.*,
    105 So. 3d 602 (Fla. Dist. Ct. App. 4th Dist. 2013) ..................................54

*CQ, Inc. v. TXU Mining Co., L.P.*,
    565 F.3d 268 (5th Cir. 2009)....................................................................34

*DHI Grp., Inc. v. Kent*,
    2022 WL 3755782 (5th Cir. Aug. 30, 2022)..............................................34

*Global Water Grp., Inc. v. Atchley*,
    244 S.W.3d 924 (Tex. App. – Dallas 2008, *rev. denied*)............................41

*Globeranger Corp. v. Software AG U.S.A., Inc*.,
    836 F.3d 477 (5th Cir. 2016)................................................................35, 39

*Guy Carpenter & Co., Inc. v. Provenzale*,
    334 F. 3d 459 (5th Cir. 2003)..............................................................42, 43

*Hensel v. Aurilio*,
    417 So. 2d 1035 (Fla. Dist. Ct. App. 4th Dist. 1982) ..................................53

*Hess Corp. v. Schlumberger Tech. Corp*.,
    26 F.4th 229 (5th Cir. 2022)................................................................28, 29

*In re TXCo Resources, Inc*.,
    475 B.R. 781 (Bankr. W.D. Tex. 2012) ........................................................39

*Jim Hawk Truck-Trailers of Sioux Falls, Inc. v.*
*Crossroads Trailer Sales & Serv., Inc*.,
    __ F. Supp. 3d __, 2023 WL 1820982 (D.S.D. Feb. 8, 2023) ..................42

*Lance Roof Inspection Serv. v. Hardin*,
    653 F. Supp. 1097 (S.D. Tex. 1986) ..........................................................42

*Leila Corp. of St. Pete v. Ossi*,
    138 So. 3d 470 (Fla. Dist. Ct. App. 2nd  Dist. 2014).................................52

*Louisiana v. Biden*,
    55 F. 4th 1017 (5th Cir. 2022).....................................................................50

*Luwisch v. Am. Marine Corp*.,
    956 F.3d 320 (5th Cir. 2020)......................................................................28

*Matter of AmeriSciences, L.P*.,
    781 F. App'x 298 (5th Cir. 2019)................................................................34

*McDonnell v. Miller*,
    655 F. App'x. 229 (5th Cir. 2016)................................................................31

*Metallurgical Indus., Inc. v. Fourtek*,
    790 F.2d 1195 (5th Cir. 1986) ..................................................38, 39, 40, 41

*M.N. Dannenbaum, Inc v. Brummerhop*,
    840 S.W.2d 624 (Tex. App. – Houston [14th Dist.] 1992, *writ denied*) .....45

*MWK Recruiting, Inc. v. Jowers*,
    833 F. App'x 560 (2020) ........................................................................23

*N. Atl. Instr., Inc. v. Haber*,
    188 F.3d 38 (2d Cir. 1999) .....................................................................35

*Nova Consulting Grp., Inc. v. Engineering Consulting Serv., Ltd.*,
    290 F. App'x 727 (5th Cir. 2008) ..........................................................42

*Ozborn-Hessey Logistics, LLC v. 721 Logistics LLC*,
    40 F. Supp. 3d 437 (E.D. Penn. 2914) ..................................................42

*Perry v. Turner*,
    365 So. 3d 1222 (Fla. Dist. Ct. App. 2nd Dist. 2023) ...........................52

*Phillips v. Frey*,
    20 F.3d 623 (5th Cir. 1994) ....................................................................34

*PNC Bank Natl Assoc. v. Smith*,
    225 So. 3d 294 (Fla. Dist. Ct. App. 5th Dist. 2017) ..............................52

*Poole on Behalf of Brian Steven Poole Estate v. City of Shreveport*,
    79 F.4th 455 (5th Cir. 2023) ..................................................................28

*Quality Sys., Inc. v. Warman*,
    132 F. Supp. 2d 349 (D. Md. 2001) .......................................................42

*Raytheon Corp. v. Indigo Sys. Corp.*,
    598 F. Supp. 2d 817 (E.D. Tex. 2009) ...................................................40

*Rosedale Missionary Baptist Church v. New Orleans City*,
    641 F.3d 86 (5th Cir. 2011) ....................................................................51

*Shahar v. Green Tree Serv.*, *L.L.C.*,
125 So. 3d 251 (Fla. Dist. Ct. App. 4th Dist. 2013) ...................................55

*Taco Cabana, Intern., Inc. v. Two Pesos, Inc.*,
932 F.2d 1113 (5th Cir. 1991), *aff'd*, 505 U.S. 763 (1992)............39, 40, 41

*Tendeka, Inc. v. Glover*,
2015 WL 2212601 (S.D. Tex. May 11, 2015) .........................................45

*The Variable Annuity Life Ins. Co. v. Miller*,
2001 WL 1598331 (Tex. App. – Amarillo Dec. 14, 2001) ......................45

*Tribeca Corp. v. Real Estate Depot, Inc.*,
42 So. 3d 258 (Fla. Dist. Ct. App. 4th Dist. 2010) ...................................52

*Webster v. Kijakazi*,
19 F.4[th] 715 (5th Cir. 2021) ..........................................................................51

*Well Cell Global LLC v. Calvit*,
__ F. Supp. 4th __, 2023 WL 175193 (Jan 12, 2023),
*rev'd on other grounds*, 2023 WL 6156082
(Fed. Cir. Sept. 21, 2023) ...................................................................35, 36

*Zoecon Indus., a Div. of Zoecon Corp. v.
American Stockman Tag Co.*,
713 F.2d 1174 (5th Cir. 1980) ............................................................35, 41

*360 Mortgage Grp. LLC v. Homebridge Fin. Serv., Inc.*,
2016 WL 900577 (W.D. Tex. March 2, 2016).........................................45

*21st Cent. Mortg. Corp. v. TSE Plantation LLC*,
301 So. 3d 1120 (Fla. Dist. Ct. App. 1st Dist. 2020) ................................52

**Statutes and Rules**

18 U.S.C. § 1839 ......................................................................34, 35

Tex. Civ. Prac & Rem. Code § 134A.002 ............................................34, 35

Fla. Stat § 542.335 ................................................48, 49, 50, 52

Fed. R. App. P. 28 ........................................................................ xiii

Fed. R. Civ. P. 12 .................................................................. *passim*

Fed. R. Civ. P. 52 ........................................................................50

Fed. R. Civ. P. 56 .................................................................. *passim*

**Treatises**

Restatement of Torts § 757 (Am. Law Inst. 1939)............................39, 40

Restatement (third) of Unfair Competition § 39
   (Am. Law Inst. 1995) ................................................................40

# JURISDICTIONAL STATEMENT

Plaintiff-Appellee concurs with Defendant-Appellant's Statement of Jurisdiction except:

i.      Defendant-Appellant failed to state the filing dates establishing the timeliness of the appeal, as required by Fed. R. App. P. 28(a)(4)(c). Jowers Brf. 1.  This appeal is timely because the district court entered final judgment on September 19, 2022, ROA.10363-64, and Defendant-Appellant filed its notice of appeal thirty days later, on October 19, 2022.  ROA.11150-52.

ii.     Defendant-Appellant states that "[t]he Court has jurisdiction to review interlocutory rulings prior to the rendition of the *Amended Final Judgment* under the merger rule," Jowers Brf. 1, but as discussed herein, this Court generally declines to review denials of motions under Rules 12(b)(6) and 56 after there has been a trial on the merits, and some courts refer to this refusal as jurisdictional.  *See infra.*, Point II(A).

# STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Did a district court commit clear error in finding that a trade secret is not generally known or readily ascertainable through proper means given that those in possession of the information keep it strictly confidential, and it is not publicly available or easily accessible to others through means like the internet, industry publications, and the like?

2.    Can a judgment awarding damages for breach of contract be reversed based on the plaintiff's unclean hands where that defense was waived in the district court, the relief obtained by the plaintiff is legal rather than equitable, and the conduct at issue was not egregious or unscrupulous anyway?

## INTRODUCTION

Defendant-Appellant Evan P. Jowers appeals from a judgment against him for misappropriating trade secrets from his employer, MWK Recruiting, Inc., and for breaching noncompete clauses in his employment agreement with MWK. Following a bench trial and post-trial briefing, the district court entered judgment for MWK for $3,640,132.60 in damages.

Jowers, a legal recruiter, doesn't dispute that he acquired highly confidential professional information from corporate attorneys at large law firms who were then working with MWK to explore changing jobs. He concedes that, while he was at MWK and after, he used this information to covertly further his own new recruiting venture by working to place those lawyers at other firms and keeping all resulting placement fees for himself, rather than share them with MWK. On appeal, he doesn't contest this self-interested diversion of information, his flouting of his pledge not to compete with his former employer, or the calculation of damages.

Instead, Jowers's appeal is very limited. Concerning misappropriation of trade secrets, he only challenges the district court's factual finding that MWK's trade secrets were not generally known to or readily ascertainable by others, which is one of the elements of the cause of action. Jowers doesn't maintain that other people could somehow easily discover the

sensitive information lawyers give to the recruiters they work with – such as their client lists and annual billings.  He argues only that such information can't be a trade secret because lawyers, in theory, could always choose to work with other recruiters and give *them* their data, too.

The district court's factual finding on the "not generally known or readily ascertainable" element is not clearly erroneous.  That court correctly found, based largely on Jowers's own testimony, that lawyers' professional information is closely guarded and not widely or freely available to others.  Recruiters only acquire such information after patiently cultivating relationships with the lawyers they serve – a process that often takes years.  To be generally known or readily ascertainable under applicable trade secrets law, information must be easily accessible to the public so that any interested party could find it, not just theoretically and privately shareable with one or two other members of a given industry.  The district court therefore didn't clearly err in finding for MWK on this issue.

As for MWK's contract claim, Jowers argues that the firm had no "legitimate business interest" as defined by Florida law justifying enforcement of its covenant not to compete because no trade secrets were at issue, reiterating his claim that the information in question was generally known or readily ascertainable.  But as MWK demonstrates in defending the

judgment for misappropriation of trade secrets, lawyers' most important career-related data is not, in fact, generally known or readily ascertainable. Moreover, the district court correctly found that other statutorily prescribed legitimate business interests beyond simply trade secret protection justify the noncompete provisions, requiring affirmance.

Jowers also urges reversal of the adverse judgment on the contract claim because, he insists, MWK acted with unclean hands in its dealings with him. This argument was waived, however, when Jowers abandoned it at trial. Nor does the doctrine of unclean hands apply to claims for legal remedies, such as damages, like MWK's claim here. And Jowers fails to marshal sufficient trial evidence of unclean hands in any event.

This Court should therefore affirm the judgment below in its entirety.

## STATEMENT OF THE CASE

### I.  Factual Background

#### A.  Jowers's Employment Agreement

Jowers is a lawyer who worked as legal recruiter at entities owned and controlled by Robert Kinney referred to herein collectively as "MWK" or "the firm." ROA.12319, ROA.12427, ROA.12166. He was employed at MWK from 2006 until resigning on December 16, 2016. ROA.12427, ROA.12166. Jowers's employment was governed by an "Associate

Recruiter Employment Agreement" that became effective on May 1, 2006 (the "Employment Agreement"). ROA7975-85, ROA.12057.[1] The Employment Agreement is governed by Florida law. ROA.7980 (¶ 12.1).

When he joined MWK, Jowers's aim was to place lawyers seeking positions in the Asian offices of large international law firms. ROA.12080, ROA.12431. In legal recruiting parlance and as reflected in the Employment Agreement, the lawyers MWK helped to place in new positions were called "candidates," while the law firms MWK worked with to fill positions or to whom it marketed candidates were called "clients." ROA.7975 (¶¶ 1.4 and 1.5). Jowers worked from the United States until 2015, traveling back and forth to Asia as needed. ROA.12286. On June 17, 2015, he relocated to Hong Kong full time. ROA.12462.

The Employment Agreement contained confidentiality and non-disclosure obligations:

The employee acknowledges that: …

3.2 The employee has been provided access to, and has received, the Company's Proprietary Information, and understands that Employee will continue to have access to the Company's Proprietary Information throughout Employee's employment. In consideration of the

[1] Jowers's Employment Agreement was with Kinney Recruiting, L.P. ROA.7975. Plaintiff-Appellee, MWK Recruiting, Inc., was a corporate successor to Kinney Recruiting, L.P., though a series of mergers and assignments, and has since merged with another Kinney entity, Counsel Holdings, Inc. ROA.12155-59; *see also* ROA.10320 n. 1.

Company's provision of Proprietary Information, Employee acknowledges and agrees that during Employee's service and thereafter, pursuant to this agreement, Employee will hold in the strictest confidence and will not disclose, discuss, transmit, use, lecture upon, or publish any Proprietary Information, except as such disclosure, discussion, transmission, use, or publication may be required in connection with Employee's service to the Company, or unless Robert Kinney expressly authorizes such in writing.

3.3    The protection of the Company's Proprietary Information, good will, and relationships with its clients and candidates is vital to the continued successful operation of the company's business.

3.4    The Company has expended and will expend considerable time and money procuring and training the Employee, providing facilities for the conduct of its business, and establishing relationships and good will with existing and prospective clients and candidates.

…

7.2    At all times during and after the Employee's employment, the Employee shall not use or disclose to any person the Company's Proprietary Information, except as such disclosure or use may be required in connection with the Employee's employment, or unless the Robert Kinney [sic.] expressly authorizes such in writing.

ROA.7976, 7978-79. Employees were also precluded from retaining the

"Company's Proprietary Information" after termination of employment.

ROA.7978 (¶ 7.1).

The Employment Agreement defined "Company's Proprietary Information" to include client and candidate lists, personal information supplied by candidates, clients' identities and information about their personnel and partnership needs, resumes, candidate and employee data sheets, and any information received from a client or candidate under an expectation of confidentiality. ROA.7975 (¶ 1.6). More generally, "[t]he Company's Proprietary Information include[d] all such information developed by its employees, whether or not during working hours, that is related to Company's business. The Company's Proprietary Information may also be trade secrets." ROA.7976 (¶ 1.6). Kinney testified that relationships with existing clients and candidates and business and marketing plans were among the confidential information he wanted to safeguard through the Employment Agreement. ROA.12103-04.

The Employment Agreement also featured non-compete and non-solicitation provisions:

4.4     The employee shall not engage in any other business activities in competition with the Company's personnel placement service business and shall not engage in any activity related to the personnel placement service business other than in benefit of the Company.

…

8.1     For a period of one year following the effective date of termination of the Employee's employment, the

> Employee shall not, in the course of the personnel placement service business, solicit or provide services to any candidate or client with whom the Employee had contact with, knowledge of, or access to during the twelve months immediately preceding the effective date of termination, and shall not assist any entity other than the Company in so doing.

ROA.7977, ROA.7979.

When he signed the Employment Agreement, Jowers told Kinney he approved of the non-compete: "Since you are investing money in me and I have projects I want done in near future that will cause more investment of time and some money, I would be happy to sign a noncompete to give you some peace of mind." ROA.8069, ROA.12083. The one-year non-compete period reflected a compromise with employees, given that the value of candidates' and clients' confidential information often extended well into the future as lawyers continued trying to move to other law firms. ROA.12098-99. As Jowers acknowledged, "it's a sensitive situation and… these things go on for years. They take years to develop." ROA.12419. Kinney agreed, testifying that it "[n]ormally takes a long time" in order "to establish that trust and confidence" needed to make a placement. ROA.12175.

### B. Jowers's Theft and Use of MWK's Trade Secrets and Confidential Information, and His Competition with MWK

Jowers made 54 placements of candidates in violation of the confidentiality, non-solicitation, and non-compete provisions of his Employment Agreement. ROA.12093, ROA.12111-12; *see also* ROA.10329-31. He was assisted in these efforts by Alejandro Vargas, another recruiter he partnered with immediately after leaving Kinney's firm. ROA.12112, ROA.12117-18, ROA.12120. Together, Jowers and Vargas founded a rival recruiting firm named Legis Ventures in November 2016, *before* Jowers left MWK the following month. ROA.2120-21, ROA.12166. Jowers used a personal email account when trying to place MWK candidates and communicate with MWK clients on behalf of Legis. ROA.12062, *see, e.g*., ROA.8531 (December 9, 2016 email from Jowers to Simon Cooke: "I am likely to launch my new company next week, so am emailing temporarily from my personal yahoo account (while still at Kinney)"). "[T]his left little way for us to stop him," Kinney testified, "or even find out about what he did." ROA.12184.

Making these placements required Jowers to acquire, misuse, and disclose confidential information and trade secrets belonging to MWK to both candidates and clients. Candidates "give us confidential information"

about their career history and aspirations, Kinney explained, which "becomes our trade secret." ROA.12231. Candidates' information constitutes a "valuable business asset" and a "significant competitive advantage" for any legal recruiting firm, without which it would be impossible to make a placement. ROA.12176. Thus, Kinney considered that his firm's trade secrets included "our client lists. It included our candidate lists. It included the specifics about the deal lists and the deal experience of our clients and candidates. It included things like how well they did in law school, you know, included stuff about why they would want to move, where they would want to move, what their most confidential desires about future employment were." ROA.12183; *see also* ROA.12161-62 (trade secrets also encompassed "all that personal information about billing rates, books of business, finance").

In fact, the information candidates give to recruiters and law firms where they hope to work, such as the identities of their clients and specifics on the amounts and nature of their billings and collections, is so closely guarded that releasing it beyond the confines of their existing employers could result in those law firms firing and suing the candidates. ROA.12079. As Jowers put it:

> But it is understood like in the recruiting industry, we're protecting the secrets of these candidates. You know, if they

are wanting – if they're thinking about starting a job search, you know, you can't go around telling people that, right?  These candidates, these individuals, they're trusting you with their secrets.

ROA.12477-78, ROA.12478 ("it's highly confidential sensitive information that clients provide and you can't let that get out in the public").

Given the sensitivity involved, candidates don't casually hand over the most important and private facts about their law practices and careers – recruiters first have to cultivate personal relationships with them in order to gain their confidence.  ROA.12078.  Often, this takes years.  ROA.12419, ROA.12175.  As Kinney put it, a legal recruiter has to "develop a level of trust with a person before he's going to trust you to give enough to give you all of his… most detailed thoughts and data points about his practice." ROA.12078.  Jowers agreed on this necessity to build rapport, noting, "[y]ou can't press a button and make placements with this information." ROA.12478-79; *see also* ROA.12470-71 ("And having relationships with them, especially, as a career-advisor, you know, you had to be available"), ROA.12505 ("This wasn't just about moving people and getting placement fees.  It's about relationships.  You want to be with them the[ir] whole… career").

In particular, Steve Kang, James Chang, Rose Zhu, Pamela Usukumah, Longhao Wang, and Meng Ding were all MWK candidates

before Jowers left the firm in December 2016. ROA.12174-75. Since they were candidates the firm was actively trying to place, Kinney considered their identities and career-related information to be MWK's trade secrets and "very difficult to ascertain" from publicly available information. ROA.12175. He also tried, through the firm's nondisclosure provisions, to keep it confidential. ROA.12232. "Mr. Jowers received highly confidential, actionable information about these specific candidates prior to his departure from [MWK] and then used that information after having left our employment without our authorization to make those placement fees of those six candidates." ROA.12183.

### 1. Steve Kang

Jowers began working to place Steve Kang, a lawyer at Freshfields, at Latham and Watkins while Jowers worked at MWK in September 2016. ROA.12066. Jowers's emails to Latham about Kang contained "[h]ighly secret information about Mr. Kang's law practice, his clients, his billings, his expected billings, his internal conflicts over credit, that sort of thing. The things that would assist someone in getting a new job and would get someone fired if they revealed to their current employer." ROA.12063; *see also* ROA.12416 (Kang didn't "like anyone talking about his practice size" outside his firm). Jowers acknowledged that he had "very confidential

information about how [Kang is] building his practice situation that's going on at Freshfields." ROA.12418. He also admitted that "[t]he only person who has this information is Mr. Kang." ROA.12422.

For example, one Jowers email to Latham detailed Kang's billings and collections for that year and noted that Kang would "be bringing with him, for your review, a printout of his financials at Freshfields. He has to keep with him after the meeting because of the confidential nature of the document." ROA.8527. Jowers assumed Latham would be "impressed with the info" and pointed out that Kang was "certain that all his business is portable and will follow him if he were to join Latham." ROA.8527.

Kinney testified that the information in Jowers's email to Latham about Kang is exactly what "we try to obtain in order to make a placement." ROA.12064. He also described it as a trade secret because it is highly confidential and "allows us an advantage over anyone else who has it and sends it to a firm that would hire this candidate." ROA.12064-65, 12135. "A partner's track record on how much he's collected from his clients is probably his single most valuable piece of information." ROA.12066. Jowers placed Kang at Latham in July or August 2017, hid the placement from MWK, and received a $171,000 fee, which he didn't share with MWK. ROA.12509, ROA.12067-69, ROA.12083-84, ROA.12410-11.

## 2. Pamela Usukumah

Usukumah, then an associate at Weil Gotshal & Manges, contacted MWK seeking help relocating to a law firm office in Asia in June 2017. ROA.8657. Kinney, in turn, passed the lead to Jowers. ROA.12206. Usukumah then emailed Jowers her CV, corporate deal sheet, and law school transcripts, which Jowers transmitted to various law firms along with her other confidential information. ROA.8659, ROA.8657-70. He succeeded in placing her at Morrison & Foerster in May 2017, for which he obtained a fee. ROA.12137, ROA.9583-84, ROA.9843.

## 3. Meng Ding

Meng Ding, a lawyer at David Polk in Hong Kong, was an MWK candidate Jowers worked on placing in July 2016, while still at the firm. ROA.8677, ROA.12138. On December 16, 2016, before Jowers resigned from MWK, Ding contacted Jowers, provided a draft CV and a list of deals he'd worked on at Davis Polk, and asked Jowers to "[p]lease keep these in strict confidence." ROA.8676. Jowers agreed that he would. ROA.8676. "[W]e would always have discrete [sic.] meetings. He didn't want anyone to see us talking." ROA.12522. Jowers marketed Ding to Kirkland & Ellis in July 2017, within the one-year non-compete period. ROA.9891-93. As part of his pitch, Jowers disclosed Ding's confidential information, such as his

deal sheet and CV, the nature of his practice ("a good mix of both equity and debt cap markets"), his language proficiency ("fluent in Mandarin and written Chinese"), his academic record, the unique skills and experience he offered a new firm, and so on. ROA.9891-93. Kirkland & Ellis then hired Ding and paid a fee to Jowers. ROA.9518.

### 4. Longhao Wang

Longhao Wang was an associate at Mayer Brown in Chicago when he sought assistance from MWK on November 28, 2016, prior to Jowers's departure from the firm. ROA.8653-56, ROA.12206. Nonetheless, Jowers and Vargas, acting for Legis Ventures, began marketing him to firms including Gibson Dunn, Latham, and Simpson Thatcher beginning at least on December 13, 2016, three days before Jowers resigned from MWK. ROA.8654. This entailed sharing information about Wang's background, practice, and career aspirations as well as his resume and law school transcript. ROA.8654. Latham hired Wang in 2018 and paid a fee to Legis. ROA.9535-36.

### 5. Rose Zhu

Jowers began working on the placement of Rose Zhu, a partner in the Beijing office of Cadwalader, Wickersham and Taft, while still at MWK in early October 2016. ROA.8598 In late 2016 and 2017, after quitting MWK,

14

he continued marketing her to different firms, including Pillsbury Madison and Winston and Strawn.  ROA.8611-12, ROA.8614-15.   For example, he emailed a lawyer at Pillsbury specifying the exact dollar amount "Rose will collect for 2016" from clients, adding that she had "been solely or primarily responsible for originating her clients at CWT and she fully expects all of her business will follow her to a new firm."  ROA.8612.  He also transmitted her list of clients, a "Summary of Revenue" itemizing her 2016 collections, and her CV.  ROA.8602-12.  Jowers ultimately placed Zhu at Baker & McKenzie in May 2017.  ROA.9400

### 6.    James Chang

Jowers worked with James Chang, an associate in Skadden's Beijing office, when he was at MWK.  ROA.8768-69.  After departing in December 2016, Jowers introduced Chang to law firms, including DLA Piper.  ROA.8585.  He conveyed information about Chang's performance reviews, his receipt of bonuses, his expected promotion at Skadden, and the clients he served.  ROA.8585.  He also sent along Chang's deal sheet and resume.  ROA.8586.  DLA Piper hired Chang on August 1, 2017 and later paid a fee to Jowers.  ROA.9451-53.

* * * *

Aside from these six candidates, Jowers earned fees for the placement of seven other MWK candidates, and candidates at eleven MWK client-law firms. ROA.10355. Overall, Kinney testified to the damage done to his business by Jowers's misuse of his firm's trade secrets and confidential information: "if people could act like him, it would put our entire business and any business that operates like ours in total jeopardy." ROA.12165. Jowers's actions "set us back years," he added; "It prevented a lot of things that we would have been able to do if he'd just given us what we asked for and what we'd agree to in this agreement, years hands off, then it would have been fine." ROA.12166.

### C. Jowers's Compensation, High Spending, Loans, and Desire for a Hong Kong Work Permit

Under the Employment Agreement, Jowers was to receive a $3,000 salary each pay period plus commissions of 45% on the first $75,000 he earned for the firm in placement fees, rising 5% with each additional $75,000 and topping out at 65% of fees over $300,000. ROA.7983. But MWK also had the power to raise or lower his pay, acting in its sole discretion, so long as it didn't do so retroactively. ROA.7978 (¶ 6.1). The firm therefore occasionally changed Jowers's compensation formula.[2]

---

[2] MWK changed Jowers's commission percentage in 2008 to an across-the-board 62.5% to help finance new advertising expenses; reduced commissions to 45% in 2009 in

Beginning in 2010, though, he consistently received 45% on fees earned under $100,000 and 50% of fees over that amount, as well as a bonus that effectively awarded him a 60% commission on fees over $300,000. ROA.12084-86, ROA.9922-29, ROA.12374. During his ten-year stint at MWK, Jowers typically earned low- or mid-six figures. ROA.8060-68.

MWK also committed to pay employees' "usual and ordinary expenses" in the Employment Agreement. ROA.7976 (¶ 2.2). Thus of $92,625.55 in expenses Jowers submitted for reimbursement while he lived fulltime in Hong Kong, the firm covered all but $1,741.92 of this through additions to his paychecks. ROA.8181-438 (expense reports and receipts totaling $92,625.55), ROA.8439-44, ROA.12248-49 (pay stubs showing reimbursements totaling $90.883.63).

One cost Kinney declined to pay, however, was Jowers's residence at the Four Seasons Hotel in Hong Kong in 2015-16. Kinney had previously covered Jowers's 2015 housing costs through a bonus. ROA.12261. But when Jowers took up residence at the Hong Kong Four Seasons, with its tab of $10,000 per month, Kinney didn't believe that was "a reasonable amount

---

exchange for paying Jowers a higher salary and paying his assistant; and then changed the commission scale to 45% on fees earned up to $100,000 and 50% of fees over that in 2010, after which Jowers's compensation did not change. ROA.12084-86. He was also bonused in a way that effectively gave him a 60% commission on fees over $300,000. ROA.12374.

to pay." ROA.12256. "I've never thought that paying for someone's personal residence was usual and ordinary," he testified. ROA.12257. This was in line with the firm's general policy of not underwriting employees' living costs as business expenses, and Jowers had been told he would have to pay his own housing costs in Hong Kong. ROA.12054-55. Even so, Kinney established a $30,000 line of credit, interest free, to help Jowers to pay for Hong Kong housing on the assumption that his commissions would cover the remainder and obviate the need for further borrowing. ROA.12056, ROA.12278-79.

Jowers proved unable to live within his means, however. Despite his usually substantial income, he executed a $150,000 revolving line of credit from a Kinney entity, at 17% interest, in November 2012. ROA.12185-86, ROA.12256-61, ROA.7998-8043. Jowers used this loan to cover spending Kinney believed was well beyond properly reimbursable, work-related charges, and Jowers himself acknowledged that it covered "a lot of expenditures for my family, which isn't just my immediate family." ROA.12256, ROA.12259, ROA.12261, ROA.12334. He also funded a vacation to St. Barts. ROA.12167.

Other recruiters at the firm either avoided such expenses or financed them out of their own pockets, but Jowers decided he needed and requested

the line of credit.  ROA.12259.  He acknowledged that Kinney didn't

threaten or coerce him into taking out the loan, ROA.12333, and while

Kinney agreed that its "price… was high," he hoped the interest rate might

persuade Jowers to rein in his spending.  ROA.12303.  Overall, Kinney

concluded that Jowers was insufficiently careful with the firm's money.

ROA.12258 (referring to Jowers "run[ning] up $50,000 tabs going around,

you know, staying in Four Seasons Hotels"); ROA.12303 ("I thought it was

damaging to our business to have an employee that was so spendthrift").[3]

After deciding to relocate full time to Hong Kong in June 2015,

Jowers hoped to transfer his employment to Kinney's Hong Kong entity,

Kinney Recruiting, Ltd., but that business had no employees and Kinney

thought the shift was unnecessary.  ROA.12218.  Jowers also wanted and

expected to apply for a work visa from the Hong Kong government, which

would have entailed furnishing immigration authorities with an employment

contract meeting certain conditions.  ROA.12382-83, ROA.12297-98,

ROA.12464.  Kinney had cooperated with one of Jowers's colleagues in

Hong Kong to secure such a visa, and she eventually received one.

---

[3]  In February 2012, Kinney also agreed to a second loan to Jowers, of $50,000, to be
forgiven after nine years if Jowers remained at MWK.  ROA.12195-96; ROA.7989-95.
This was a way to reward Jowers for his work the prior year while simultaneously
incentivizing him to stay at the firm long enough to get the pay-out.  ROA 12089-90,
ROA.12196.  Jowers agreed with the loan-in-lieu-of bonus idea.  ROA.12196.

ROA.12383.  But after some equivocation and correspondence with Jowers over several months, Kinney ultimately concluded that supporting a visa application for Jowers wouldn't serve the firm's interests.

Specifically, Kinney decided he should only back Jowers's request "if he was able to get his financial picture straight… where the costs that we were incurring in Hong Kong were sufficient to rent a real office, which is very expensive, and hire staff so it wasn't just Mr. Jowers over there and that it just never happened."  ROA.12298.  "I had set certain goals for Mr. Jowers," Kinney continued, "one of which was paying off his debts, the other was getting his lifestyle down to a level that was supportable with the income that I expected that we could get while also employing other people in Hong Kong.  And it was only after we had gotten to a level where we could as a business make money there that I was interested in giving that support."  ROA.12302.  Bankrolling Jowers's excessive (as Kinney saw it) lifestyle could "cause all sorts of instability in the organization."  ROA.12303.  Kinney denied Jowers's accusation that Hong Kong's more restrictive rule on non-compete agreements was the reason he chose not to

form a new contract with Jowers governed by Hong Kong law.

ROA.12298.[4]

In any event, the absence of a work visa proved no barrier to Jowers's success as a recruiter; he "hit [his] highest revenue [he'd] ever done in twelve months at Kinney" over his first full year in Hong Kong, June 2015 to June 2016. ROA.12383-84. "The revenue, the profits [for the firm] were off the charts," he allowed. ROA.12383-84, ROA.12495. Thus, in 2015, Jowers earned $657,448.97 (pretax), and in 2016 he was paid $519,784.86 (pretax). ROA.8067-68.

Although he wanted the work visa, Jowers initially decided "it will all work out. I'll have the visa in a few months and no one will really care that I was there for a few months really living without the work visa. And since I had been traveling back and forth so much, maybe it will all just merge together." ROA.12466. Eventually, though, he testified that he became fearful of arrest, and that his status prevented him from opening a local bank account and made it "hard to get health insurance." ROA.12467, ROA12495. Still, Hong Kong authorities never took action of any kind against Jowers because he lacked a visa or otherwise, and he continued to

---

[4]  Hong Kong law purportedly allows noncompete agreements but requires payment of salary during the restricted period – a provision called "garden leave." ROA.12293, ROA.12491-92.

travel freely to the United States and other locations in Asia, as always. ROA.12494.  Until October 2016, he chose not to quit in order to preserve his commissions and income.  ROA.12496-98, ROA.12499-500.

Today, Jowers continues to be a successful recruiter and part-owner of Legis Ventures, the firm he founded with Vargas.  ROA.12388-89.

## II.    Procedural History

MWK filed suit against Jowers and other defendants in Texas state court on March 27, 2017, and the case was then removed to federal court. ROA.54-107.  The operative pleading, MWK's Second Amended Complaint, asserts claims against Jowers for trade secret misappropriation under both federal and state law, breach of the Employment Agreement, and breach of the two agreements by which MWK loaned money to Jowers (the revolving line of credit, and the forgivable loan offered in lieu of a bonus). ROA.1716-24, ROA.1728-29.

Jowers moved to dismiss these claims under Fed. R. Civ. P. 12(b)(6), but the district court denied the motion.  ROA.1951-88, ROA.2052-82. Jowers then answered and asserted various counterclaims.  ROA.3174-246. Following discovery, the parties cross-moved for summary judgment. ROA.6090-101, ROA.6465-91.  The district court denied Jowers's motion

and granted Kinney's as to all but one of Jowers's counterclaims.

ROA.13640-71.[5]

The case was tried to the bench over three days, December 6-8, 2021.

ROA.12018-587. The only witnesses were Kinney, Jowers, and another

MWK recruiter. ROA.12018-587. The parties then filed proposed findings

of fact and conclusions of law, after which the district court issued its own

findings of fact and conclusions of law on September 15, 2022.

ROA.10184-318, ROA.10319-62.

The court found that Jowers committed trade secret misappropriation:

> The Court finds that the information Jowers gathered as to
> Kang, Zhu, Usukumah, Ding, Chang, and Wang – including
> their names, their clients, how much their practices were worth,
> their language skills, their goals for switching firms, and their
> law school records – constituted MWK's trade secrets. *See
> supra* Part II.A. The evidence supports that Jowers received
> and acted on this information about these clients while he was
> working at MWK. *Id.* Further, Jowers was under an obligation
> to maintain the privacy of these candidates through the Jowers
> Agreement and through the nature of the recruiting business,
> which depends on establishing long-term trust relationships
> with clients.

ROA.10342. The district court also rejected Jowers's contention that

MWK's trade secrets were generally known or readily ascertainable through

proper means:

---

[5] During pretrial litigation, this Court vacated the district court's grant of a foreign antisuit injunction. *See MWK Recruiting, Inc. v. Jowers*, 833 F. App'x 560 (2020).

Jowers's own testimony belies the argument that this information was readily ascertainable, as he testified repeatedly about his clients' desires to keep their information secret and that much of the information he was able to gather about the six candidates was because he had long-time relationships with them. (*See* Tr. II, at 154 ("[The information Jowers had about Kang] couldn't be monetized or used by any other recruiter if they had it because you can't just take this and throw it into some system and start making placements."); *id.* at 214 ("[Client information is] highly confidential sensitive information that clients provide and you can't let that get out in the public."); *see also* P-77, Dkt. 341-3, at 20 (email from Ding asking Jowers to keep his information "in strict confidence").

Additionally, the district court found that Jowers breached the noncompete and confidentiality clauses of the Employment Agreement, and that the restrictive covenants in that contract are justified by legitimate business interests as defined by the governing Florida statute. ROA.10348-49. The Court narrowed the covenants, however, invalidating the clause precluding service to clients or candidates Jowers merely had "knowledge of" or "access to." ROA.10349-50. Finally, the district court found that Jowers breached his two loan agreements with MWK. ROA.10356-60.

Regarding damages, the district court awarded $515,326.60 for trade secret misappropriation, representing fees Jowers received for the placement of five of the six candidates MWK's case centered on, excepting Longhao Wang. ROA.10345-46, 10362. It awarded $3,082,841.72 in damages for breach of the Jowers Agreement relating to seven candidates and eleven

clients, with the figure derived from the contract's liquidated damages clause awarding a breaching ex-employee's ill-gotten placement fees to MWK. ROA.10353-55, ROA.10362, ROA.7979 (¶ 9.1). The court also awarded a total of $41,964.68 for Jowers's breach of the two loan agreements. ROA.10362.

The district court issued its final judgment on September 19, 2022, and Jowers timely appealed. ROA.10363-64, ROA.11150-52. As post-judgment litigation occurred in the district court, this Court stayed the appeal by order issued March 6, 2023. The district court then issued an amended final judgment on July 25, 2023, adding $823,749.63 in prejudgment interest, ROA.14068-70, after which proceedings resumed in this Court.[6]

## SUMMARY OF ARGUMENT

The district court's decision was correct and should be affirmed.

Initially, Jowers attacks the judgment against him for misappropriating MWK's trade secrets by arguing that the district court erroneously denied his motions for judgment on the pleadings and for summary judgment. These decisions are not reviewable on appeal after there has been a full trial on the merits, however. *See* Point II(A), *supra*.

---

[6] The district court's Amended Final Judgment also changed the style of the case to denote Counsel Holdings, Inc. as the proper plaintiff, since it is MWK's successor in interest to each of the agreements and claims at issue. ROA.14068.

Jowers's only argument on the trade secrets claim not based on these pretrial motions is that the district court committed clear error in finding that MWK's trade secrets were not generally known or readily ascertainable through proper means. After all, Jowers claims, MWK candidates could always have disclosed their most important and confidential professional information to other recruiters.

This misapprehends the meaning of "generally known" and "readily ascertainable" under trade secrets law. To be generally known or readily ascertainable, the information must be *public* and easily accessed by anyone who wants to know using tools like the internet or widely available trade publications – not just hypothetically disclosable to one or two others in the industry if the originator of the secrets sees some advantage in sharing them. Ample evidence at trial established that candidates keep their confidential, practice-related information close to the vest, and that recruiters only acquire it after long cultivation of personal ties. It isn't possible to obtain or glean this information from public sources, or for a recruiter to just pick it up somehow. MWK's trade secrets were, therefore, not generally known or readily ascertainable, and the district court didn't clearly err in finding for MWK on this element. *See* Point II(B), *supra*.

The district court's judgment on MWK's claim for breach of the Employment Agreement's restrictive covenants should also stand. Jowers again begins by attacking the district court's summary judgment decision, but this is unreviewable following trial. Next, he reprises his claim that MWK had no protectible trade secrets – and therefore no "legitimate business interest" justifying the noncompete provisions under Florida statutory law – because the firm's information about candidates was generally known and readily ascertainable. As explained above, though, MWK's trade secrets were not actually generally known or readily ascertainable. Moreover, the district court correctly found that other statutorily prescribed legitimate business interests beyond simply the safeguarding of MWK's trade secrets justify the restrictive covenants. Finally, Jowers asserts that the doctrine of "unclean hands" precludes enforcement of the restrictive covenants he agreed to, but this argument was waived below and, in any case, is both legally and factually baseless. *See* Point III, *supra*.

The Court should affirm the judgment in its totality.

## ARGUMENT

### I. Following a Bench Trial, the Court Reviews the District Court's Factual Findings for Clear Error, and its Legal Conclusions De Novo

"On appeal from a bench trial, this court reviews the factual findings of the trial court for clear error and conclusions of law de novo." *Cloud v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 83 F.4th 423, 429-30 (5th Cir. 2023); *Poole on Behalf of Brian Steven Poole Estate v. City of Shreveport*, 79 F.4th 455, 459 (5th Cir. 2023). Indeed, the Court "give[s] great deference to factual findings made during a bench trial," *Poole*, 79 F.4th at 459; *Hess Corp. v. Schlumberger Tech. Corp.*, 26 F.4th 229, 233 (5th Cir. 2022), and "will upset the district court's findings of fact only if we are left with the definite and firm conviction that a mistake has been committed." *Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 326 (5th Cir. 2020). Thus, as the Supreme Court has said, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985); *Brumfield v. Cain*, 808 F.3d 1041, 1057 (5th Cir. 2015), *cert. denied*, 578 U.S. 1023 (2016). As long as "there are two permissible views of the evidence, the

factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574; *Hess Corp.*, 26 F.4th at 233.

## II. The Judgment Against Jowers for Misappropriation of Trade Secrets Should Be Affirmed

### A. Jowers's Complaints About the District Court's Decisions Under Rules 12(b)(6) and 56 Are Not Reviewable

Jowers first argues that judgment for MWK on its trade secrets claim should be reversed because the district court erred in denying his motions for failure to state a claim under Fed. R. Civ. P. 12(b)(6), and for summary judgment under Fed. R. Civ. P. 56. Jowers Brf. Points II(A)-(B). These objections can't support reversal, however, since the case proceeded to judgment following a full trial on the merits.

Initially, Jowers's contention that the judgment should be reversed because MWK didn't "adequately plead the requisite trade secret under Texas and federal law" is unreviewable. Jowers Brf. 23. "After a trial on the merits, the sufficiency of the allegations in the complaint is irrelevant…. When the plaintiff has prevailed after a full trial on the merits, a district court's denial of a Rule 12(b)(6) dismissal becomes moot." *Bennett v. Pippin*, 74 F.3d 578, 585 (5th Cir.), *cert. denied*, 519 U.S. 817 (1996). Consequently, "this court refuses to review the denial of a challenge to the sufficiency of a complaint after a final judgment has been entered."

*Carlmont Cap. Special Purpose Corp. II v. Anderson*, 285 F. App'x. 185, 187 (5th Cir. 2008); *accord Castellano v. Fragozo*, 311 F.3d 689, 700 (5th Cir. 2002), *vacated on other grounds*, 352 F.3d 939 (5th Cir. 2003) (en banc), *cert. denied*, 543 U.S. 808 (2004).

In any event, Jowers's attack on MWK's complaint is off base. Jowers argues that the complaint fails to specify MWK's trade secrets, Jowers Brf. 23-24, but MWK *did* identify candidates' and clients' compilations of information as its trade secret and the "key drivers for fee-paying placement activity." ROA.1695 (¶¶ 48-49), ROA.1717 (¶ 137) (citing confidential information about candidates' desires to change jobs, their preferred destinations, and expectations about compensation as among trade secrets). While some data could be collected from public sources, MWK alleged, "vast amounts of the most valuable information becomes known to MWK" only through its time-consuming work with candidates who retained the firm because of its reputation "in the market." ROA.1717 (¶ 137). And MWK's trade secrets were not easily learned by others. ROA.1717-18 (¶ 139) (competitor would need "to hold a similar market position to MWK" and invest "years of effort" and marketing). MWK also alleged that its "business model, market position, and profits depend" on its

trade secrets. ROA.1718 (¶ 141). The district court therefore correctly

denied Jowers's Rule 12(b)(6) motion. ROA.2072-73.

Jowers likewise faults the district court for failing to grant his motion

for summary judgment, asserting that there was insufficient evidence

accompanying MWK's opposition to his motion establishing that MWK's

clients' confidential information was not generally known or readily

ascertainable. Jowers Brf. 25. "This was a failure of proof in MWK's prima

facie case on the trade secrets claims," he maintains, "and further warrants

reversal." *Id*. at 26.

This, too, is unreviewable. "It makes no sense whatever to reverse a

judgment on the verdict where the trial evidence was sufficient merely

because at summary judgment it was not." *Black v. J.I. Case Co., Inc.*, 22

F.3d 568, 572 (5th Cir.), *cert. denied*, 513 U.S. 1017 (1994). As a result,

summary judgment denials founded on the existence of a factual dispute

may not be reviewed after trial on the merits. *See id*., *Blessey Marine Serv.,*

*Inc. v. Jeffboat LLC*, 771 F.3d 894, 897 (5th Cir. 2014); *Becker v. Tidewater*,

586 F.3d 358 n. 4 (5th Cir. 2009); *McDonnell v. Miller*, 655 F. App'x. 229,

234 (5th Cir. 2016).

True, this Court has "recognized a narrow exception to this rule…

holding that if the appellant seeks review of 'the district court's legal

conclusions in denying summary judgment, *and* the case was a bench trial,'
we have jurisdiction to review the denial of summary judgment." *Blessey
Marine Serv.*, 771 F.3d at 897 (*quoting Becker*, 586 F.3d at 365 n. 4,
emphasis in original).  But Jowers doesn't fault a legal ruling by the district
court, such as the construction of a statute or a misapplication of precedent.
He complains only that the district court failed to analyze and weigh the
summary judgment evidence correctly and should have recognized the
absence of a factual dispute on one of the elements of trade secret
misappropriation.  Jowers Brf. 26.  As he puts it, Kinney's affidavit
opposing summary judgment reflects "a failure of proof" on the factual
element of secrecy, *id.*, which the district court presumably should have
perceived.  This is not a legal error or ruling on a question of law by the
lower court and, consequently, cannot now support reversal.

Regardless, the district court was right to deny Jowers's summary
judgment motion.  Jowers faults Kinney's opposition for omitting testimony
from MWK candidates that they didn't share their professional information
with other recruiters or would have refused to if asked.  Jowers Brf. 25.  As
discussed below, however, this misconstrues the "generally known or readily
ascertainable" element; proof of this nature from candidates was not
necessary.  *See* Point II(B), *infra*.  To the degree Jowers also criticizes

Kinney's affidavit for failing to establish that the secrets weren't generally known or readily ascertainable, Jowers Brf. 26, this is erroneous, too. Kinney detailed the information obtained by Jowers about various candidates with great specificity – data such as their clients, their collections and billing, their practice histories and preferences, their family and educational background, and so on.  ROA.13511-14 (¶¶ 68-74).  He also averred that this information was not generally known or readily ascertainable because the candidates kept it strictly confidential, as would any recruiter.  ROA.13514 (¶¶ 76-77).  The district court therefore correctly held that MWK adequately put the elements of its trade secret claim into dispute, warranting denial of Jowers's motion.  ROA.13664.

>    **B.**    **The District Court's Judgment Should Be Affirmed Because its Factual Finding that MWK's Trade Secrets Were Not Generally Known or Readily Ascertainable Is Not Clearly Erroneous**

Once Jowers's complaints about pretrial rulings are set aside, he makes only one other argument against the district court's judgment for misappropriation of trade secrets: that MWK's trial evidence was insufficient to support a finding that its trade secrets were not generally known and not readily ascertainable through proper means.  The court's factual finding against him on this issue is not clearly erroneous, though – meaning that its judgment must be affirmed.

## 1. Applicable Principles of Trade Secrets Law

Federal and Texas law define trade secrets the same way. *Compare* 18 U.S.C. § 1839(3) *with* TEX. CIV. PRAC & REM. CODE § 134A.002(6). In general, a trade secret is any "compilation of information" that is "used in one's business" and which "presents an opportunity to obtain an advantage over competitors who do not know or use it." *Academy of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc*., 998 F.3d 190 n. 3 (5th Cir. 2021) (*quoting Computer Assoc., Int'l, Inc. v. Altai., Inc*., 918 S.W.2d 453, 455 (Tex. 1996)); *CQ, Inc. v. TXU Mining Co., L.P*., 565 F.3d 268, 274 (5th Cir. 2009).[7]

Specifically, the identities of a firm's clients and customers, their personal and confidential information, and commercially useable confidential information about them all unquestionably constitute trade secrets under Texas and federal law. "Trade secrets include customer lists, client information, customer preferences, and buyer contacts." *Matter of AmeriSciences, L.P*., 781 F. App'x 298, 309 (5th Cir. 2019); *accord DHI Grp., Inc. v. Kent*, 2022 WL 3755782 at * 4 (5th Cir. Aug. 30, 2022); *Phillips v. Frey*, 20 F.3d 623, 628 (5th Cir. 1994); *see also* TEX. CIV. PRAC. & REM.

---

[7] The federal Defend Trade Secrets Act additionally requires a showing that the product was used in interstate commerce, 18 U.S.C. § 1836 – an element not contested here.

CODE § 134A.002(6) (trade secrets include "list of actual or potential customers").[8] Jowers does not contest this.

For information to qualify as a trade secret under both federal and Texas law, its owner must also have taken reasonable measures to keep it secret, and the information must derive independent economic value from "not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3); TEX. CIV. PRAC. & REM. CODE § 134A.002(6).

Whether information will be deemed a trade secret is a question of fact. *CAE Integrated, L.L.C. v. Moov Tech., Inc*., 44 F.4th 257, 262 (5th Cir. 2022); *Globeranger Corp. v. Software AG U.S.A., Inc*., 836 F.3d 477, 492 (5th Cir. 2016) (Texas law). More particularly, "[w]hether customer information is generally known or readily ascertainable is a question of fact." *Zoecon Indus., a Div. of Zoecon Corp. v. American Stockman Tag Co*., 713 F.2d 1174, 1179 (5th Cir. 1980); *Well Cell Global LLC v. Calvit*, __

---

[8] Under federal law, *see, e.g*., *Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 179, 189-93 (1st Cir. 2023) (spreadsheets of Allstate insurance customers including "names, addresses, phone numbers, email addresses, renewal dates, types of insurance policies, and premiums paid by insurance customers"); *Ahern Rentals, Inc. v. EquipmentShare.com, Inc*., 59 F.4th 948, 955 (8th Cir. 2023) (customer lists and rental and pricing information properly alleged to be trade secrets); *N. Atl. Instr., Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999).

F. Supp. 4ᵗʰ __, 2023 WL 175193 at * 7 (Jan 12, 2023), *rev'd on other grounds*, 2023 WL 6156082 (Fed. Cir. Sept. 21, 2023).

> **2.** **The District Court's Factual Finding on the "Not Generally Known or Readily Ascertainable" Element Is Not Clearly Erroneous**

Jowers's sole, trial-related argument contesting his loss on MWK's trade secrets claim is that the district court wrongly found that MWK's trade secrets were not generally known and not ready ascertainable through proper means. Jowers Brf. 26-28. On that issue, the court below found that MWK's candidates' "names, their clients, how much their practices were worth, their language skills, their goals for switching firms, and their law school records" were trade secrets, and that "Jowers's own testimony" proved that this data was neither generally known nor ready ascertainable. ROA.10342. As the district court correctly noted, Jowers himself "testified repeatedly about his clients' desires to keep their information secret and that much of the information he was able to gather about the six candidates was because he had long-time relationships with them." *Id.*

In this Court, Jowers doesn't appear to challenge the fact that MWK clients wanted to maintain the confidentiality of their key professional information. Nor could he, of course, having testified that "it is understood [] in the recruiting industry, we're protecting the secrets of these

candidates… if they're thinking about starting a job search, you know, you can't go around telling people that, right?... [T]hey're trusting you with their secrets." ROA.12477-78. "[I]t's highly confidential sensitive information that clients provide and you can't let that get out in the public," Jowers added. ROA.12478. A great deal of other evidence also established this fairly obvious fact, including Kinney's testimony about the confidentiality of candidates' data and that disclosing items like client lists, billing figures and revenue amounts outside of law firms could result in firing and litigation. ROA.12078-79. Plus, in emailing with Jowers, some candidates expressly expressed their desire for secrecy. ROA.12416, ROA.8676.

Rather than dispute the highly confidential nature of candidates' information, Jowers claims MWK nonetheless failed to establish that it was not generally known or readily ascertainable through proper means because MWK didn't offer testimony from the candidates themselves that they had to "work exclusively with MWK, or were prohibited from sharing their information with any other recruiters, or would have refrained from sharing their information with any other recruiters… [T]here is nothing that prevents these individuals from sharing their career-related information with others." Jowers Brf. 26-27. Jowers's position seems to be that information otherwise agreed to be highly confidential is actually generally known and/or readily

ascertainable through proper means under federal and Texas trade secrets law because the person with whom it originates is free to disclose it to someone else and may always, hypothetically, choose to do so.

There are at least two things wrong with this argument. First, it would destroy trade secret protection. If secrecy is voided whenever the person who originated the protected information retains the power to disclose it to someone else, then very little would qualify for legal protection. Consider an employee who walks out the door with his firm's secret chemical formula and begins using it in his new venture. Is the formula not a trade secret – is it necessarily generally known and readily ascertainable – because his old firm can always make the decision to share the formula with someone else? By Jowers's logic, almost nothing would be secret – perhaps only information the originator was legally or contractually bound not to divulge. But there is no indication trade secrets or the statutory terms "not being generally known" and "not being readily ascertainable through proper means" are so limited, and Jowers cites no law suggesting they are.

On the contrary, case law indicates that the holder of a trade secret may disclose it to a limited circle of other people without sacrificing legal protection. In *Metallurgical Indus., Inc. v. Fourtek*, for example, this Court

denied that the plaintiff's sharing of information about its industrial process with two other commercial collaborators vitiated the information's secrecy:

> Although the law requires secrecy, it need not be absolute. Public revelation would, of course, dispel all secrecy, but the holder of a secret need not remain totally silent:
>
> > He may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy.... Nevertheless, a substantial element of secrecy must exist, so that except by the use of improper means, there would be difficulty in acquiring the information.
>
> RESTATEMENT OF TORTS § 757 Comment b (1939). We conclude that a holder may divulge his information to a limited extent without destroying its status as a trade secret. To hold otherwise would greatly limit the holder's ability to profit from his secret. If disclosure to others is made to further the holder's economic interests, it should, in appropriate circumstances, be considered a limited disclosure that does not destroy the requisite secrecy.

790 F.2d 1195, 1200 (5th Cir. 1986); *accord Globeranger*, 27 F. Supp. 3d at 748-49; *In re TXCo Resources, Inc*., 475 B.R. 781, 805 (Bankr. W.D. Tex. 2012).

Similarly, in *Taco Cabana, Intern., Inc. v. Two Pesos, Inc*., Two Pesos was found to have misappropriated Taco Cabana's trade secrets in architectural drawings, kitchen design, and operating procedures, and these secrets didn't lose protection because Taco Cabana also shared them with contractors: "If a voluntary disclosure occurs in a context that would not

ordinarily occasion public exposure, and in a manner that does not carelessly exceed the imperatives of a beneficial transaction, then the disclosure is properly limited and the requisite secrecy retained." 932 F.2d 1113, 1124 (5th Cir. 1991), *aff'd*, 505 U.S. 763 (1992). In this case, even if MWK candidates hypothetically chose to share their career-related information with another recruiter, that additional disclosure would not erase trade secret protection since those other recruiters would also keep the candidates' information confidential, as do all recruiters. *See Fourtek*, 790 F.2d at 1200 (trade secret holder can disclose to others "pledged to secrecy" (quoting RESTATEMENT OF TORTS § 757 Cmt. b (Am. Law Inst. 1939)).

More broadly, generally known and readily ascertainable information, within the meaning of the trade secrets statutes, is information anyone can easily learn in actuality – not information the possessor or originator has the legal right to disclose to someone else and may or may not choose to share at some point. "The theoretical ability of others to ascertain the information through proper means does not necessarily preclude protection as a trade secret." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39(f) (Am. Law Inst. 1995); *Raytheon Corp. v. Indigo Sys. Corp*., 598 F. Supp. 2d 817, 821 (E.D. Tex. 2009). Put differently, to be generally known and readily ascertainable, there must be "*public* revelation" and "*public* exposure."

*Fourtek* (emphasis added)*, supra*; *Taco Cabana* (emphasis added)*, supra.* A competitor or other interested party must encounter little or no "difficulty in acquiring the information." *Fourtek*, 790 F.2d at 1200 (quoting RESTATEMENT OF TORTS § 757 cmt. b (Am. Law Inst. 1939)); *accord Zoecon Indus.*, 713 F.2d at 1179 (information not readily ascertainable if it "could be compiled only at considerable expense"); *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 973 (8th Cir. 2011) ("The fact that information can be ultimately discerned by others – whether through independent investigation, accidental discovery, or reverse engineering – does not make it unprotectable…. Instead, the court must look at whether the duplication of the information would require a substantial investment of time, effort, and energy"), *cert. denied*, 568 U.S. 817 (2012).

Examples of information that is generally known or readily ascertainable through proper means include customers listed in dictionaries and online and who attend trade shows,[9] a recipe easily duplicated through trial and error,[10] an easily reproduceable formula with well-known ingredients,[11] customer contacts and their email addresses and phone

---

[9]    *CAE Integrated*, 44 F.4th at 263.

[10]    *Bimbo Bakeries, USA, Inc. v. Sycamore*, 39 F.4th 1250, 1264 (10th Cir. 2022).

[11]    *Global Water Grp., Inc. v. Atchley*, 244 S.W.3d 924, 930 (Tex. App. – Dallas 2008, *rev. denied*).

numbers that are easily gleaned through trade publications,[12] and customers

"commonly known within an industry."[13] *Guy Carpenter & Co., Inc. v.*

*Provenzale*, cited by Jowers, perfectly fits this pattern in that the customer

list and products at issue there were "freely disclosed" by "participants in the

reinsurance market." 334 F. 3d 459, 468 (5th Cir. 2003); Jowers Brf. 24.[14]

By contrast, customer and client lists are not deemed generally known or

readily ascertainable if they require lengthy relationship-building and

personal contacts,[15] or if reproducing them would take a substantial

investment of time and energy.[16]

---

[12] *Ozborn-Hessey Logistics, LLC v. 721 Logistics LLC*, 40 F. Supp. 3d 437, 452 (E.D. Penn. 2914).

[13] *Lance Roof Inspection Serv. v. Hardin*, 653 F. Supp. 1097 (S.D. Tex. 1986).

[14] Jowers also cites *Quality Sys., Inc. v. Warman*, 132 F. Supp. 2d 349 (D. Md. 2001), Jowers Brf. 27-28, which declined to extend trade secret protection to a financial report; a database of resumes obtained from the internet, applicants and headhunters; an employee database with personal information; and contract and project files. *Id.* at 356. But in holding that these were readily ascertainable by other means, the decision fails to explain why, *see id.* – leaving no way to compare ascertainability there with the salient facts here.

[15] *See, e.g., Nova Consulting Grp., Inc. v. Engineering Consulting Serv., Ltd*., 290 F. App'x 727, 735 (5th Cir. 2008) (trade secret in client information exists where client recruitment "takes an enormous amount of time and resources"); *Jim Hawk Truck-Trailers of Sioux Falls, Inc. v. Crossroads Trailer Sales & Serv., Inc*., __ F. Supp. 3d __, 2023 WL 1820982 at * 6 (D.S.D. Feb. 8, 2023) (customer list protected where firm's employees had to personally recruit customers and relationships took "years to get in place").

[16] *Bodemer v. Swanel Beverage, Inc*., 884 F. Supp. 2d 717, 725 (N.D. Ind. 2012) ("A reasonable jury could conclude that it would take a substantial investment of time, expense, or effort to identify Swanel's customers by attending trade shows, advertising in trade publications, and making cold calls").

Were MWK candidates to choose to share their career-related data with another chosen recruiter or two, there would still be no *public* dissemination of their information.  Others with interest, including other recruiters on the hunt for lawyers to represent, would have no way to easily access it.  As both Kinney and Jowers testified, recruiters must and do safeguard the privacy of their candidates' data.  *See supra*. at 8-11.  They also agreed that a recruiter must invest in lengthy and time-consuming relationship-building in order to gain candidates' trust; only after this is achieved do they acquire the most closely held information candidates have to offer about their practices in order to try to place them in new jobs.  *See supra*. at 7, 10.  "[T]hese things go on for years," Jowers allowed; "[t]hey take years to develop."  ROA.12419; *see also* ROA.12175 (Kinney: it "[n]ormally takes a long time" in order "to establish that trust and confidence").

Nor are candidates' client lists, billings, collections, desires to switch firms, and the like available online or in directories; widely known or "freely disclosed" in the legal industry, *Carpenter*, *supra*; visible at trade shows; or easily picked up through tinkering and trial and error.  Far from – in describing recruiters' obligations to safeguard their candidates' secret data, Jowers testified: "it's highly confidential sensitive information that clients

provide and you can't let that *get out in the public*."  ROA.12478 (emphasis added).  In other words, recruiters are professionally bound and financially incentivized to keep candidates' information away from the public – yet public accessibility is the *sine qua non* of ready ascertainability under trade secrets law.  Similarly, Kinney flatly testified that the billing, client, and other data given to Jowers by Kang and the five other MWK candidates, was "not readily ascertainable by people.  In fact, very difficult to ascertain." ROA.12175.  In short, MWK's trade secrets were simply nothing like the data courts have held to be generally known or readily ascertainable.

The second difficulty with Jowers's argument here is that, even if it is legally correct to say that MWK's candidates' information could lose trade secret protection because candidates could hypothetically deliver it to another recruiter, the factual record in this case establishes the improbability of any such disclosure to one or more of Jowers' competitors.  As noted, provision of the candidates' secret, practice-related information isn't willy-nilly but follows the protracted building of rapport between recruiter and candidate.  *See supra* at 7, 10.  And Jowers testified that he was much more than just a legal recruiter – he was a career advisor intent on serving candidates throughout their careers.  "This wasn't just about moving people and getting placement fees," he declared.  "It's about relationships.  You

want to be with them the whole step of their career." ROA.12505. Years

elapse as personal connections are carefully nurtured. *See supra* at 7, 10.

This evidence directly contradicts the notion that the specific MWK

candidates at issue in this case did, or would, casually reveal their inside

information to multiple competing recruiters at once or move from one to

the next, spreading key facts about their practices all around the legal world.

Nor does Jowers cite to evidence suggesting this. In addition to

misunderstanding the terms "not generally known" and "not readily

ascertainable," then, Jowers's argument is also belied by the factual record

in this case regarding the particular MWK candidates involved.

Finally, the district court correctly observed that "information about

potential candidates that other recruiting firms also had access to can still be

considered a trade secret" under Texas law. ROA.10341. This is true in

cases where the defendant obtained the information from his prior employer.

*Id.* This rule has often been applied, and "a number of courts in Texas have

continued to recognize [its] viability." *A.M. Castle & Co. v. Byrne*, 123 F.

Supp. 3d 909, 919-20 (S.D. Tex. 2015) (collecting cases).[17] Here, there is

---

[17] *See, e.g., 360 Mortgage Grp. LLC v. Homebridge Fin. Serv., Inc.,* 2016 WL 900577 at
* 4 (W.D. Tex. March 2, 2016); *Tendeka, Inc. v. Glover*, 2015 WL 2212601 at * 14 (S.D.
Tex. May 11, 2015); *Alliantgroup, L.P. v. Feingold*, 803 F. Supp. 2d 610, 625-26 (S.D.
Tex. 2011); *The Variable Annuity Life Ins. Co. v. Miller*, 2001 WL 1598331 at * 3 (Tex.
App. – Amarillo Dec. 14, 2001); *M.N. Dannenbaum, Inc v. Brummerhop*, 840 S.W.2d
624, 633 (Tex. App. – Houston [14th Dist.] 1992, *writ denied*); *but see Baxter Assoc.,*

no disagreement that Jowers acquired MWK client and candidate data while still a recruiter at MWK. As a result, even if the candidates shared their data with other recruiters, as Jowers posits, it would not lessen his liability.

The district court's factual finding that MWK's trade secrets were not generally known or readily ascertainable through proper means was not clearly erroneous, which dooms Jowers's appeal on MWK's trade secrets claim.

## III. The Judgment Against Jowers for Breach of the Employment Agreement Should Also Be Affirmed

Jowers offers three reasons to overturn the district court's judgment in MWK's favor on its claim for breach of the restrictive covenants included in the Employment Agreement: the court should have granted summary judgment, MWK had no trade secrets to protect through the covenants, and MWK's unclean hands precludes their enforcement. None of these has merit.

### A. The Court Cannot Review the District Court's Summary Judgment Order

As with his argument against MWK's judgment for misappropriation of trade secrets, Jowers seeks to look back before the bench trial and

---

*L.L.C. v. D&D Elevators, Inc.*, 2017 WL 604043 at * 9 (Tex. App. – Dallas 2017) (common law rule displaced by Texas trade secret statute).

overturn the district court's decision denying his motion for summary judgment.  Jowers Brf., Point III(A).  Here too, the Court should decline to review Jowers's complaint about the summary judgment ruling because it was followed by trial on the merits.  *See* Point II(A), *supra*.  Like his argument contesting the denial of summary judgment on MWK's trade secrets claim, Jowers does not attack a legal ruling by the district court.  Jowers Brf. 30-31.  He merely claims MWK didn't proffer sufficient evidence putting into dispute whether the restrictive covenants were reasonably necessary to protect the firm's legitimate business interests.  *See id*.  This is the sort of fact-based summary judgment ruling not open to review after trial on the merits.  Point II(A), *supra*.[18]

Nor, in any case, is there merit to Jowers's argument relating to the summary judgment motion.  Jowers claims Kinney's declaration opposing summary judgment needed to explain why the restrictive covenants were reasonably necessary to protect its trade secrets.  Jowers Brf. 30.  But Kinney's declaration doesn't address this point because Jowers's motion never sought summary judgment on this ground, ROA.6465-91, which is

---

[18]   To the degree Jowers also intends to critique MWK's complaint, Jowers Brf. 29, this is also unreviewable, as noted above, *see* Point I(A), *supra*, and MWK adequately alleged the existence of a trade secret, *see id.* – protection of which Florida law regards as a sufficient legitimate business interest.

also why the district court's order denying his motion is silent on it.

ROA.13640-71.

**B.** **The Restrictive Covenants Properly Protected MWK's Legitimate Business Interests as Defined in Florida Law**

Next, Jowers argues that MWK lacked "legitimate business interests" under Florida law justifying enforcement of the restrictive covenants. Jowers Brf., Point III(B). The Court should reject this objection to the judgment.

Florida law permits enforcement of a restrictive covenant if it is "justif[ied]" by the "existence of one or more legitimate business interests," including:

1. Trade secrets, as defined in § 688.002(4).

2. Valuable confidential business or professional information that otherwise does not qualify as trade secrets.

3. Substantial relationships with specific prospective or existing customers, patients, or clients. [and]

4. Customer, patient, or client goodwill associated with:

   a. An ongoing business or professional practice, by way of trade name, trademark, service mark, or "trade dress";

   b. A specific geographic location; or

   c. A specific marketing or trade area.

Fla. Stat § 542.335(1)(b).

Jowers's only argument here is to reiterate his claim that MWK's information doesn't merit protection under trade secrets law. Jowers Brf., Point III(B). For the reasons discussed above, Jowers is wrong – the district court correctly found that MWK had protectible trade secrets. *See* Point II(B), *supra*. What's more, Jowers ignores that the district court also found that other statutorily prescribed interests support the covenants, including protecting MWK's "[v]aluable confidential business or professional information that otherwise does not qualify as trade secrets," its "[s]ubstantial relationships" with specific candidates and clients, and "[c]ustomer… or client goodwill." *Id.*; ROA.10348-49. Indeed, Jowers agreed that career-related information from candidates is, at a minimum, valuable confidential business and professional information. ROA.12477-78. It is also undisputed that, while at MWK, Jowers formed substantial relationships with MWK candidates that the firm lost any benefit from when he left in December 2016. *See supra* at 10-15. There is no question, then, that MWK meets the "legitimate business interest" test of § 542.335(1)(b),

regardless of the parties' dispute over the existence of trade secrets.  This

Court should therefore affirm the judgment below.[19]

### C. Jowers's Unclean Hands Defense Has Been Waived and Is Meritless Anyway

Lastly, Jowers attacks the judgment for breach of the Employment

Agreement on the ground that MWK's purportedly unclean hands preclude

enforcement of the restrictive covenants.  Jowers Brf., Point IV.  This

argument is both waived and, on its merits, baseless.

To begin with, Jowers waived his unclean hands defense by failing to

raise it when moving for a judgment on partial findings under FED. R. CIV. P.

52(c), and in his post-trial brief and proposed findings of fact and

conclusions of law.  ROA.12526-34, ROA.10299-318.  To the degree

Jowers's post-trial briefing mentioned the central fact underlying his unclean

hands defense – MWK's decision not to facilitate his application for a Hong

Kong work permit – it was to make a completely different point: that the

applicable contract between the parties wasn't the Employment Agreement

but a later, draft, never-executed "Hong Kong contract."  ROA.10308-10.

Jowers never gave the district court any Florida law on unclean hands or

---

[19] Jowers takes a stab at arguing that MWK should be limited to protecting its trade secrets as its only legitimate business interest under § 542.335(1)(b) because, by his reading, that was the only interest put forward in MWK's complaint.  Jowers Brf. 29. The point is irrelevant because the Court can affirm the judgment below on any ground supported by the record. *Louisiana v. Biden*, 55 F. 4th 1017, 1022 (5th Cir. 2022).

explained why the facts elucidated at trial fit the defense as correctly construed. *Id.* As a result, the district court never ruled on unclean hands, considering the defense abandoned. ROA.10333 n. 5 ("Further, Jowers failed to testify or direct the Court to any evidence regarding his defenses of waiver, estoppel, lack of consideration, rescission, or unclean hands, nor did he mention the defenses in his post-trial briefing. The Court therefore declines to rule in Jowers's favor based on these defenses").

This Court will not review arguments on appeal that weren't made in a manner sufficient for the district court to rule on them. *See Webster v. Kijakazi*, 19 F.4th 715, 720 (5th Cir. 2021); *Rosedale Missionary Baptist Church v. New Orleans City*, 641 F.3d 86, 89 (5th Cir. 2011). Aside from noting that the unclean hands defense appears in his pleadings and asserting that supporting evidence can be culled from the record, Jowers Brf. 32, Jowers's appellate briefing never explains why this Court should adjudicate the defense when it was never directly argued below in a way that asked for and allowed a ruling. Rather, he effectively wants this Court to find facts the district court didn't, and then line those facts up with law that court never saw. This Court should decline the invitation and find that Jowers waived the unclean hands defense.

If the Court does consider the defense, it should find the unclean hands doctrine inapplicable. Unclean hands will bar claims for equitable relief, not claims for damages. "The unclean hands doctrine applies to any unrighteous, unconscientious, or oppressive conduct *by one seeking equitable interference in his own behalf.*" *PNC Bank Natl Assoc. v. Smith*, 225 So. 3d 294, 296 (Fla. Dist. Ct. App. 5th Dist. 2017) (emphasis added; quotation omitted); *accord Perry v. Turner*, 365 So. 3d 1222, 1224 (Fla. Dist. Ct. App. 2nd Dist. 2023) ("*one who seeks the aid of equity* must do so with clean hands;" emphasis added; quoting *Leila Corp. of St. Pete v. Ossi*, 138 So. 3d 470, 473 (Fla. Dist. Ct. App. 2nd Dist. 2014)); *21st Cent. Mortg. Corp. v. TSE Plantation LLC*, 301 So. 3d 1120, 1122 (Fla. Dist. Ct. App. 1st Dist. 2020) ("The unclean hands defense applies to bar an equitable claim"); *Tribeca Corp. v. Real Estate Depot, Inc*., 42 So. 3d 258, 262 (Fla. Dist. Ct. App. 4th Dist. 2010) ("As it is an equitable remedy, a party seeking such a lien must do so with clean hands").

Jowers cites a provision in Florida's restrictive covenants law providing that, "[i]n determining the enforceability of a restrictive covenant, a court… [s]hall consider all other pertinent legal and equitable defenses." FLA. STAT § 542.335(1)(g)(3); Jowers Brf. 32. But this provision means only that, when a party seeks to enforce a restrictive covenant in law or in

equity, his or her opponent may assert standard legal and equitable defenses; it doesn't imply that equitable defenses are suddenly available in legal actions. And notably, the only case Jowers cites for the applicability of unclean hands to the enforcement of a restrictive covenant is one where the plaintiff sought equitable relief – a preliminary injunction – not damages for breach of contract. *See Bradley v. Health Coalition, Inc.*, 687 So. 2d 329, 334 (Fla. Dist. Ct. App. 3rd Dist. 1997) ("The employee was entitled to present these defenses against the application for temporary injunction"). Unclean hands, therefore, cannot be the basis for overturning a judgment awarding the legal remedy of damages for breach of a contract.

Finally, the record doesn't support Jowers's unclean hands defense anyway. "Equity will stay its hand where a party is guilty of conduct condemned by honest and reasonable men. Unscrupulous practices, overreaching, concealment, trickery or other unconscientous conduct are sufficient to bar relief." *Hensel v. Aurilio*, 417 So. 2d 1035, 1038 (Fla. Dist. Ct. App. 4th Dist. 1982) (quotation omitted). No such behavior occurred here.

Jowers complains of reductions in compensation by 5%, Jowers Brf. 33, yet the Employment Agreement permitted MWK to modify Jowers's compensation "in its sole discretion," as long as changes didn't operate

retroactively. ROA.7978 (¶ 6.1). MWK was therefore fully within its contractual rights to change Jowers's pay over the life of his employment there. If breaching a contract doesn't rise to the level of unclean hands, *Congress Park Ofc. Condos II, LLC v. First-Citizens Bank and Trust Co*., 105 So. 3d 602, 608 (Fla. Dist. Ct. App. 4th Dist. 2013), adhering to one surely doesn't.

Jowers also complains about the revolving line of credit, with 17% interest, that he used to cover some of his spending. Jowers Brf. 33-34. Jowers asserts that he was forced to pay for firm expenses using this high interest loan, *id*., but Kinney testified that the spending in question was not on properly reimbursable work-related charges (such as a vacation to St. Barts), and Jowers himself admitted that it covered "a lot of expenditures for my family, which isn't just my immediate family." ROA.12256, ROA.12259, ROA.12261, ROA.12334, 12167. Any conflict in this testimony must be resolved in MWK's favor. *See* Point I, *supra*. Moreover, Jowers acknowledged that Kinney didn't threaten or coerce him into taking out the line of credit, which he did voluntarily. ROA.12333. In that event, the loan could hardly be considered unscrupulous.

Above all, Jowers claims MWK exhibited unclean hands by refusing to take steps needed for him to obtain a work visa in Hong Kong. Jowers

Brf. 34-36. But Jowers points to no contractual or other obligation that bound MWK to support the visa application. Kinney communicated support for this endeavor on some occasions but ultimately changed his mind because he believed Jowers never met the goals of paying off debt and running a stable and financially sound operation there justifying the expense of paying for an office and other employees. ROA.12298, 12302. Again, this explanation must be credited on appeal, even if Jowers testified differently. Nor was Jowers injured in any serious way by his lack of a visa. He claims only that he couldn't open a local bank account and that his status made it "hard to get health insurance." ROA.12467, ROA12495. Conduct that causes no injury cannot evince unclean hands, *Shahar v. Green Tree Serv., L.L.C.,* 125 So. 3d 251, 255 (Fla. Dist. Ct. App. 4th Dist. 2013), and feeling jittery about legal consequences from immigration authorities which never materialized doesn't amount to appreciable harm.[20]

---

[20]  Jowers also states: "Had MWK followed through on the work visa and entered into a Hong Kong law-compliant employment agreement with Jowers, it would have to make 'garden leave' payments to Jowers to enforce the restrictive covenants which are the subject of this action." Jowers Brf. 35. This conflates claimed injury from not receiving a visa with claimed injury from not entering into a completely different and more favorable employment contract ("a Hong Kong law-compliant employment agreement"). But Jowers nowhere explains why it would have been evidence of unclean hands to decline to form a new employment agreement with him. MWK had no obligation to terminate Jowers's existing employment arrangement and enter into a new one on less advantageous terms for the firm.

In the end, Jowers's grievance against Kinney over the work visa is misplaced. Jowers is a responsible adult and, even more, a lawyer. If he chose to live and work illegally in Hong Kong for 18 months, he shouldn't fob the blame off on others. Or, put another way, if abiding by Hong Kong law or easing his fear of legal action were truly important to him, he had only to return to the United States. After all, he worked successfully as a legal recruiter of lawyers seeking to practice in Asia while living in this country for nine years, from 2006 to 2015. The reason he chose to stay in Hong Kong in 2015-16 despite the absence of a visa was simple: he had "hit [his] highest revenue" yet for any one-year period, generating profits that "were off the charts." ROA.12383-84, ROA.12495. That is, Jowers liked the considerable income he was making and evidently thought Hong Kong was the most profitable place to be, so he managed to overcome any scruples or "panic" he supposedly felt as a result of working without a visa. Jowers Brf. 35.

Unclean hands has been waived here, and it is inapplicable to damages actions anyway. But even if neither of those things was true, Jowers has still failed to point to record evidence supporting the defense that would warrant overturning the district court's judgment for breach of contract.

## CONCLUSION

The Court should affirm the judgment below in its entirety.

November 30, 2023                          Respectfully Submitted,


                                            s/ *Martin J. Siegel*
                                           Martin J. Siegel
                                           LAW OFFICES OF
                                              MARTIN J. SIEGEL, P.C.
                                           2222 Dunstan Road
                                           Houston, Texas 77005
                                           Telephone: (281) 772-4568

                                           *Attorney for Plaintiff-Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that on this day of November 30, 2023, the foregoing

Plaintiff-Appellee's Brief was served on the following via the Court's ECF Filing

system:

Richard N. Asfar
Almazan Law
515 W. Bay Street, Suite 210
Tampa, Florida 33606
rasfar@almazanlaw.com

Aaron G. McLeod
Adams and Reese LLP
1901 6th Ave. North
Suite 1110
Birmingham, AL 35203
Aaron.mcleod@arlaw.com

*Counsel for Defendant-Appellant*

s/      *Martin J. Siegel*
Martin J. Siegel

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. Civ. P. 32(a)(7)(B) because this brief contains 12,584 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief is printed in a proportionally spaced typeface using the Microsoft Word 2004 for Mac, Version 11.5.6, program in 14 point, Times New Roman font in body text and 12 point, Times New Roman font in footnote text.

s/        *Martin J. Siegel*
Martin J. Siegel


Dated:  November 30, 2023